Janice BUTTRUM, Petitioner,

v.

Gary BLACK, Warden, Middle Georgia Correctional Institute, Women's Division, Respondent.

Civ. A. No. 4:87–cv–258–HLM.

United States District Court, N.D. Georgia, Rome Division.

Sept. 20, 1989.

Bruce S. Harvey, Office of Bruce S. Harvey, Atlanta, Ga., George Haywood Kendall, III, Office of George H. Kendall, New York City, for petitioner.

Susan Virginia Boleyn, Office of State Atty. Gen., Atlanta, Ga., for respondent.

## ORDER

HAROLD L. MURPHY, District Judge.

Petitioner Janice Buttrum, a Georgia inmate sentenced to death for murder, presents this petition for habeas corpus relief pursuant to 28 U.S.C. § 2254. She attacks both her conviction for murder and her death sentence imposed by a jury in 1981. For the reasons set forth below, habeas corpus relief from her conviction for murder shall be DENIED, and relief from her sentence of death shall be GRANTED.

### I. PROCEDURAL AND FACTUAL HISTORY.

#### A. *Procedural History.*

On August 29, 1981, a Whitfield County jury found Janice Buttrum guilty of the

murder of Demetra Faye Parker, in violation of O.C.G.A. § 16–5–1, and of motor vehicle theft, in violation of O.C.G.A. § 16–8–18. Two days later, the jury sentenced her to death. Her conviction and sentence were affirmed on appeal by the Georgia Supreme Court. *Buttrum v. State*, 249 Ga. 652, 293 S.E.2d 334 (1982). Subsequently, she filed a state petition for habeas corpus; a hearing was held on the petition; and all relief was denied. When the Georgia Supreme Court denied a certificate of probable cause to appeal the denial of state habeas relief, Buttrum filed this petition in federal court.[1]

### B. Factual Background.

The evidence and testimony presented at Janice Buttrum's trial and pretrial proceedings revealed the following facts.

Nineteen year old Demetra Faye Parker was raped, sodomized, and stabbed ninety-seven times in her motel room at the Country Boy Inn, in Whitfield County, during the early morning hours of September 3, 1980. Demetra had moved to Whitfield County from Tennessee to be near her boyfriend.

Janice Buttrum and her husband, Danny, also lived at the Country Boy Inn and were acquaintances of Demetra Parker. Demetra occasionally drove them to the store and laundromat since the Buttrums had no car. Danny was twenty-eight and Janice, seventeen. The two married when Janice was fifteen, and their nineteen-month-old daughter lived with them at the motel. Danny Buttrum had recently escaped from a Cobb County, Georgia, prison work camp. On the night of the murder he had consumed three six packs of beer. Danny had a violent background, and in the Buttrum's two-year marriage, he beat Janice numerous times.

### The Night of the Murder

The night before the pre-dawn murder, Demetra Parker was in her motel room watching television with two male friends.

The three saw Danny pacing back and forth 15 to 20 times in front of Demetra's room. Demetra told her friends she was afraid of him, and they locked the door. She drove her friends home at approximately 8:30 p.m.

Christopher Busby also lived at the motel in August and September, and on the evening of September 2, he and Danny drank beer together. At 7:00 to 7:30 p.m., Busby, and the Buttrums, left the motel with their baby to buy beer. This brief beer run turned into a five hour excursion that included a number of stops. Busby testified at trial that while they were riding in his car, Danny told him he wanted to pick up a girl. Busby asked him if his wife, who was in the back seat, wouldn't mind, and Danny replied, "No, as long as she gets to go with her first."

During several stops, Danny made passes at four different women, while Janice remained in the back seat of Busby's car. Several female witnesses testified they were approached by Danny that night but refused his drunken advances. Busby and the Buttrums returned to the motel room at about midnight. Danny then borrowed Busby's car, and the Buttrums were gone for about three more hours, returning at 3:45 a.m., September 3. Pam Henry, a motel resident, testified that at approximately 4:00 a.m. she heard a girl screaming.

### Janice Buttrum's Accounts of the Murder

Agent Johnson of the Georgia Bureau of Investigation testified about the investigation of the case and the arrests of the Buttrums. Over defense objection he related one of Janice's post-arrest confessions. According to Johnson, Janice Buttrum stated that at about 4:00 a.m., she and her husband went to Demetra's room to scare her. She knocked on the door, and when Demetra opened the door and then attempted to close it, Danny pushed it open, and

---

1. Because of the length of the opinion, this factual overview dwells briefly on two aspects of the case that might otherwise await later discussion: the petitioner's four accounts of the murder and the mitigation evidence concerning her personal history. These matters provide a necessary background to the numerous legal issues that follow.

they went inside and struggled with the girl. Janice then stabbed the girl and they fell to the floor. Janice and Danny were on opposite sides of the girl, and they took turns stabbing her. Janice said she stabbed her about fifteen minutes [sic], gave the knife back to Danny; he stabbed her, and gave the knife back to her. Janice lifted Demetra's nightgown to see where her heart was, and then cut Demetra across the stomach because "it was the only place left to cut," and because Demetra was still living and she thought that might kill her. The Buttrum's daughter was in the room playing with the telephone. The Buttrums went back to their motel room, took Demetra's car and fled. Janice told agent Johnson she had no remorse about the killing.

Agent McFaul of the F.B.I., one of the arresting officers, testified about the contents of another statement Janice made shortly after her arrest. The additional details revealed by this statement were the following: When the Buttrums entered Demetra's room, Danny threw Demetra down. Danny had a pocket knife in his hand and was struggling with Demetra. Janice took the knife and stabbed Demetra. Both stabbed her numerous times, and while Janice was stabbing her, Danny was masturbating. Afterwards, they washed their hands with a cloth in Demetra's room and stole her car. Janice also told Agent McFaul, "[T]hat girl sure didn't want to die."

Janice made two other statements about the incident. One was during her incarceration while Danny Buttrum was on trial. She wrote a letter to be given to the Sheriff in which she claimed she killed Ms. Parker as an act of jealousy because Danny was trying to have sex with her. She took complete responsibility for the crime and said she forced Danny to do everything he did, including raping Ms. Parker.

Finally, at her capital sentencing hearing, Janice testified that it had been Danny's idea to go to Ms. Parker's room the evening of the crime; that she waited outside the room for five minutes after Danny entered; that when she entered, Danny was removing Ms. Parker's panties and she believed they "were fixing to have sex." After becoming angry at the sight of Danny and Ms. Parker engaging in sex, Ms. Buttrum testified that she grabbed the knife and stabbed Ms. Parker in the chest. She admitted that her conduct was wrong and that she deserved to be punished. She denied having oral sex with the victim.

### The Autopsy

Dr. James Metcalfe, Associate Pathologist at Hamilton Memorial Hospital performed the autopsy on Demetra Parker at 11:00 p.m. on September 3, 1980. Demetra was 5'8½" and weighed approximately 100 lbs. She incurred sixty-seven stab wounds to her left chest with a maximum depth of 2". The blade penetrated several ribs and her left lung. Metcalfe observed 24 stab wounds and cuts in the front neck area with several cuts to the windpipe. Spinal stab wounds were 2" deep and cut into the backbone. A gaping gash had been inflicted to Demetra's lower abdomen exposing her bowels. Demetra suffered a 4" cut in the genital area, as well as damage to the vagina and rectum from forcible penetration. Hemorrhages and bruise marks were observed on Demetra's scalp, nose, knees, and genital region. Finally, there was a 1 to 1½" bite mark on her neck. A plastic toothbrush holder had been forced into her vagina.

Metcalfe stated the vast majority of injuries around the vagina and anus occurred while Demetra was alive. Demetra died only after the attack or towards the very end of the prolonged assault. The stab wounds to the chest and neck finally resulted in her death.

### The Flight and Arrest

At approximately 5:00 a.m. on September 3, the Buttrums and their child drove to a truck stop where Mr. Buttrum worked. Petitioner borrowed $20.00 from the truck stop manager, stating, "I don't know if you know what's going on or not, but if anyone asks you, you have not seen us."

Chambracant Patel, manager of the motel, reported Ms. Parker's death and told the police that her car was missing. He told them that Ms. Parker had spent time

the previous day with the Buttrums, and that the Buttrums appeared to have checked-out of their room. A search of the Buttrum's room revealed a bar of soap and washcloth covered with blood. Armed with this information, the police secured arrest warrants for Danny and Janice Buttrum.

Further investigation revealed that the couple had contacted Danny Buttrum's mother and requested that she wire money to Pensacola, Florida. Before noon on September 4, F.B.I. agents spotted and arrested the Buttrums in Pensacola and charged them with the murder of Demetra Parker.

Later that day, Janice Buttrum was interrogated by agents of the F.B.I. and gave the statement to Agent McFaul noted above. She turned over a ring and a barrette taken from the victim. On September 6, in the custody of Georgia law enforcement officials, the Buttrums were returned to Whitfield County. Shortly after her arrival, Janice was interrogated again and provided the statement recounted by Agent Johnson above.

### Pretrial Proceedings

On September 10, 1980, counsel was appointed to represent Ms. Buttrum. After two weeks, counsel filed a motion to withdraw, expressing doubt about his ability to discharge faithfully his responsibilities. The motion was denied, and the trial court appointed co-counsel. On October 2, the court acknowledged sweeping media interest in the case and issued a gag order. The order was subsequently lifted when the court found that the order created more publicity than it deterred.

Counsel moved the court for funds to hire a psychiatrist, an investigator, and a forensic criminologist. The court denied the motion, but agreed to have state psychologists examine Ms. Buttrum to determine her sanity and competency to stand trial. In February 1981 a jury found her competent to stand trial. Trial was postponed, however, until late summer to await the birth of her second child.

In March, 1981, Danny Buttrum was tried. The news media comprehensively reported the evidence introduced at the trial, including Danny Buttrum's confession. The media reported that Ms. Buttrum had participated in the stabbing and murder of the victim and had committed oral sodomy on the victim. After deliberating less than an hour, the jury convicted Danny Buttrum of all counts charged. The following day, after deliberating less than 40 minutes, the jury sentenced him to death.

Ten days before the commencement of Janice Buttrum's trial, the prosecutor served notice that it intended to call a private psychologist, Dr. Henry Adams, in the penalty phase of the trial to testify that Ms. Buttrum was a sexual sadist who would continue to be dangerous in the future. Defense counsel vigorously, but unsuccessfully, renewed their motion for funds for a private psychologist.

After a hearing on a defense motion for change of venue based on prejudicial, pre-trial publicity, the trial court permitted sequestered voir dire of the prospective jurors. After voir dire, the court denied the motion for a new venue.

### The Trial and Sentencing

The defense offered no evidence at trial. Through cross-examination and argument it contended that Janice participated in the murder but acted under the domination of her husband. The jury found Janice guilty as charged.

At the penalty phase of the trial, the prosecution called one witness, Dr. Henry Adams, who testified that Janice Buttrum was a sexual sadist who could be expected to repeat similar acts in the future. In response, the defense presented no psychological testimony but presented testimony about Janice Buttrum's background in mitigation of punishment.

### Janice Buttrum's Personal History

Evidence from former teachers, social workers, and others revealed the following. Janice Buttrum's unmarried mother gave her to a middle-aged, foster couple, the Adcocks, in exchange for payment of the hospital bill. She grew up in a three-room,

unpainted house with no bathroom. Later the Adcocks lived in a one-bedroom trailer, and Janice's bedroom was a broken-down van in the yard. The trailer was filthy, the floor covered with dirt, paper, beer bottles, and moldy food. Janice's clothing was obtained at the city dump, and she was likely subjected to physical and emotional abuse. One social worker testified that during the many times he went to her home he never saw her step-mother sober. After Mr. Adcock died Ms. Adcock's boyfriend lived in the trailer.

At school Janice Buttrum's peers ridiculed and ostracized her because she was dirty and smelled horrible. Her hair was matted, her face and nails always dirty, her clothes too big, and she usually went barefoot even in winter. One teacher stated: "She never carried on a conversation with anybody; she just always stood over to herself." Other children laughed and made fun of her. She was the most neglected child several teachers and social workers had ever seen. Nevertheless, she was not a discipline problem; she was described as shy, passive, very quiet, extremely non-violent, very withdrawn, with a low self-image, a follower, and having a passive personality.

During her early teen years, Ms. Buttrum ran away from home. She was befriended by an older man who, along with another man, sexually assaulted her. At age 14, she was declared a deprived child and was placed in the custody of Bartow County. She was shuttled between foster homes, returned to Mrs. Adcock and finally placed, at Mrs. Adcock's instigation, in a Youth Detention Center. While she had committed no crime, the state simply had no other place for her to live. She remained there for six months.

At age 15, she returned to Mrs. Adcock's home. Shortly thereafter, a friend of her mother's introduced her to Danny Buttrum. Danny was 26 years old, divorced, and the father of two children. On the first evening of their meeting, Ms. Buttrum agreed to marry him. They were married within a month.

The jury heard evidence that Ms. Buttrum was often the victim of beatings sustained at the hand of Danny Buttrum. When Danny was sober, he was non-violent. When he drank, he became abusive, beating her 15–20 times during their two-year marriage. On several occasions, Janice swore out warrants against him.

The defense introduced other evidence showing that Danny Buttrum had several prior convictions, that he had a reputation for being uncontrollable after drinking; that he was the boss in the relationship, and that on the night of September 2, the eve of the crime, he was drinking heavily and had a "mean" attitude.

The jury found that the murder had been committed in the course of a rape, that it was outrageous, vile and inhuman; and that it involved torture, depravity of mind, and an aggravated assault to the victim. On the murder count, the jury sentenced Ms. Buttrum to death.

## II. CONSTITUTIONAL CHALLENGES: THE GUILT–INNOCENCE PHASE.

### A. The Denial of Buttrum's Motion for Change of Venue Because of Pretrial Publicity and the Failure To Excuse Certain Jurors for Cause.

 Janice Buttrum contends that prejudicial and inflammatory pretrial publicity so pervaded and saturated Whitfield County at the time of her trial that it was impossible to empanel an impartial jury. She contends the trial court violated her constitutional rights when it denied her pre-trial motion for a change of venue. The principles that govern this change of venue issue derive from the fourteenth amendment's due process clause, "which safeguards a defendant's Sixth Amendment right to be tried by 'a panel of impartial, "indifferent jurors." ' " *See Coleman v. Kemp,* 778 F.2d 1487, 1489 (11th Cir. 1985), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986), *quoting Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *see also Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). Where pretrial publicity has so inflamed and saturated a com-

munity that it is impossible to draw an impartial jury from that community, due process requires that the trial court grant a motion of the defendant for a change of venue for trial or a continuance of the trial. *See Coleman,* 778 F.2d at 1489; *citing Rideau,* 373 U.S. at 726, 83 S.Ct. at 1419; *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975). A defendant tried and convicted by a jury prejudiced against him, is denied a fundamentally fair trial. At a minimum, due process requires a unbiased decision maker.

There are at least two different standards for judging the effects of prejudicial pretrial publicity. One standard is that used in cases such as *Irvin* and *Jordan v. Lippman,* 763 F.2d 1265 (11th Cir.1985). There, prejudice is shown when the pretrial publicity has created a significant possibility of prejudice and the trial court has failed to conduct an adequate voir dire to unearth and eliminate the prejudice from the jury. *See Jordan,* 763 F.2d at 1274–79.

■ Prejudice may be presumed, however, where a petitioner proffers evidence of inflammatory, prejudicial pretrial publicity that has so pervaded or saturated the community, that jury prejudice may be presumed. In such a case, there is no further duty on the petitioner to establish bias. *See Coleman,* 778 F.2d at 1490, *quoting Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981). Cases of presumed prejudice are rare. *See Coleman,* 778 F.2d at 1490 (and cases cited therein).

In *Rideau,* the defendant's confession to a bank robbery, kidnapping, and murder was videotaped and subsequently broadcast three times by a local television station. The three broadcasts were seen respectively by 24,000, 53,000, and 29,000 in a community that had a population of 150,-000. *See id.,* 373 U.S. at 724, 83 S.Ct. at 1418. The Supreme Court held that the denial of the defendant's motion for change of venue constituted a denial of due process. Although the Court noted that three of the venirepersons had seen the broad-cast, the Court stated that prejudice was to be presumed, "without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury." *Id.,* 373 U.S. at 727, 83 S.Ct. at 1420.

In *Coleman,* four defendants were charged with a brutal execution-like murder of six members of a family. Seminole County, the venue of trial was a community of approximately 7,000. The extensive, prejudicial, and inflammatory pretrial publicity in the case was reviewed by the court in 45 pages of the *Federal Reporter. See id.* at 1491–1536. The publicity tracked the defendants from their arrest through trial, including the reporting of the detailed testimony of one of the defendants who had turned state's evidence. The publicity was reflective of a community roused with hostility and largely convinced that death was the only appropriate remedy. *Id.* at 1538–40. The court found the pretrial publicity equal to *Rideau,* presumed the existence of prejudice, and held that the grant of habeas relief was warranted. The court, however, in dicta noted that it assumed that in an appropriate case the presumption of prejudice might be rebutted by the respondent, through a showing that the voir dire was adequate to eliminate any actual prejudice from the jury. The court, however, found no occasion to resolve that issue because the voir dire in that case was inadequate and did not rebut the presumption of prejudice.

■ In this case, the pretrial publicity so pervaded and saturated Whitfield County that prejudice must be presumed under *Coleman* and *Rideau.* Nevertheless, the Court finds the presumption of prejudice rebutted by an examination of the voir dire. The voir dire shows that the jury actually empaneled was not so infected by the publicity that the jurors could not lay aside any preconceived opinions about the case and render a verdict solely upon the evidence. Habeas corpus relief on this issue therefore must be denied.

### 1. The Pretrial Publicity.

Following the approach of the Eleventh Circuit in *Coleman,* this Court shall review

the pretrial publicity in some detail. Several demographic facts were brought out in the pre-trial proceedings which are relevant to the inquiry. The trial court found at a pre-trial hearing on the issuance of a "gag order" that the population of Whitfield County at the time of the trial was between 60,000 and 70,000. This population is roughly a median between the population of Seminole County, at issue in *Coleman*, and of Calcasieu Parish, at issue in *Rideau*. Further, at a pre-trial hearing on Buttrum's motion for change of venue, Dr. Lawrence E. Noble, a professor of political science and expert in media analysis summarized the media coverage in Whitfield County:

> Newspaper circulation in Whitfield County where there are 20,000 registered voters, is approximately 17,500 daily. Newspaper readership approximates two readers per newspaper. This would mean that there is an average daily readership in Whitfield County of over 30,000. One other newspaper, a weekly now out of business, the *Valley Observer*, had a circulation unknown to me. There are some 20,000 TV households in the county, and local radio audiences are approximately 10,000 or more.

*The Discovery of the Crime and the Buttrums' Arrests.*

Within hours of the discovery of Ms. Parker's body on September 3, 1980, local and regional media began coverage of the case that did not subside until after Janice Buttrum's trial. Almost every one of the hundreds of media reports about the case in the year from the arrests through Ms. Buttrum's trial highlighted the sensational facts that the victim was 19, that her body was found almost nude, that her body had been mutilated, stabbed almost 100 times, that she had been sexually molested, raped, and tortured before death. Most also informed the readers that the suspects were a young married couple.

The Dalton daily newspaper, the *Daily Citizen–News*, began the publicity with a front page story on September 4, "Girl, 19 Murdered; 2 Suspects Jailed." [2] It reported,

> After viewing the repeatedly stabbed nude body of a 19–year–old woman at Country Boy Motor Inn, Sheriff Jack Davis said Wednesday it was the most brutal murder he had investigated in Whitfield County.

The story reported that the coroner, as well, could not recall a more brutal murder. A report of the *Chattanooga Times* the same day dubbed the crime a "sex-torture-slaying case." "Police said the woman had apparently been tortured before her death. Officers also found a four-inch to five inch slash across her stomach. The stab wounds, according to [detective] Gribble, covered the stomach, chest, breast and neck of the victim." It reported that the room was in disarray with blood over large areas of the walls and floor.

On September 4, radio station WBLJ reported that Ms. Parker's "nude and butchered body" had been discovered in a pool of blood, and that Ms. Parker had been stabbed 95–100 times and was sexually tortured. Also on that day, radio and television stations reported that "an escapee from the Cobb County Georgia work camp and his wife" had been arrested in the "multiple stabbing." They reported that Sheriff Davis had stated that the Buttrums and the victim were acquaintances, that the couple was driving the victim's car when arrested, and that the motive was believed to have been "sex-related." WBLJ radio reported that Janice Buttrum had helped Danny escape from state custody.

The *Daily Citizen–News* reported on September 5 that "toys and clothing belonging to a child were among the hastily abandoned items left in an apartment reportedly occupied by the Buttrums, just a few doors down from where the murder occurred." The *Chattanooga News–Free*

---

2. Copies of the media reports for the period of up to March 1981 are in Respondent's Exhibit 5. Those covering the period after March 1981 are generally at pages 1234–83 of the trial transcript.

*Press* and the *Chattanooga Times* reiterated the same details of the crime.

The media described the victim as a wonderful, young, bright, wholesome, all American girl, who had come to Dalton to live near her boyfriend. On September 9, the *Daily Citizen–News* along with a high school photo reported that Ms. Parker was from a small Tennessee farm town, had been in a beauty contest, was "very naive and trusting," had sung in the Baptist Church choir, and had plans of attending college.

> She befriended a young couple with a baby while staying at the Country Boy Motor Inn ..., offering to drive them places since they didn't seem to have transportation, Anderson said. They were later charged with her murder.

The article described the devastation felt by Ms. Parker's friends, family, and the community:

> Choked with emotion as he spoke of "my baby sister," Anderson said hundreds of people crowded in to view two funeral ceremonies in the neighboring communities ... to pay final respects to the girl.

On September 9 the *Chattanooga Times* reported about the "incensed residents" of Dalton and that Danny Buttrum had been attacked by other inmates at the jail and placed in isolation. District Attorney Williams said his phone had been ringing off the hook about the case and that he would fight a change of venue motion in order to keep the trial in Whitfield County. The *Daily Citizen–News* also reported the attack on Danny Buttrum.

On September 12, the *Daily Citizen–News* reported that the District Attorney had decided to seek the death penalty. The same day a *Chattanooga Times* article was headlined "Dalton Prosecutor Wants 2 Die." The article reported that the DA said the case, "absolutely called for the [death penalty]." Radio and television also reported the DA's decision. On September 16, 1980, the *Daily Citizen–News* headline read, "Buttrum Gouges Wrists," reporting that Danny "cut his wrists with a 'gouge-type' instrument."

In early October, the setting of the preliminary hearing gave opportunity to the *Daily Citizen–News* and the *Chattanooga Times* to recount again the facts of the crime. On October 2, because of the amount of pretrial publicity being generated, the trial court issued a gag order, closed the preliminary hearing, and proscribed law enforcement officials from talking about the case.

WBJL first reported that an earlier report that the Buttrums had sued the Sheriff's Department for $500,000 for leaking information to the press was erroneous and that the Buttrums sought only a closure order. The broadcast reminded the listeners of the facts of the crime:

> 29 year old Danny Buttrum and his 17 year old wife Janice are accused in the September 3rd sexually related slaying of 19 year old Demetra Faye Parker of Dyersburg, Tennessee. Ms. Parker's nude body was found in her room at Country Boy Inn at Carbondale. An autopsy revealed she had been stabbed *95* to *100* times, then sexually assaulted and tortured. The Buttrums were arrested the next day in downtown Pensacola, Florida. *He* was allegedly arrested while sitting in the victim's car. She was at a nearby sandwich shop.

The *Chattanooga Times* reported similar facts about the closed preliminary hearing and added that both Janice and Danny were being held in isolation for their protection from other prisoners. The *Chattanooga News–Free Press* reported a similar story about the hearing.

On October 9, the *Daily Citizen–News* published a front page article denying allegations that the Whitfield County Sheriff's Department had prior notice of Danny Buttrum's presence in the county nine days before the crime.

*The Motion to Continue the Presentment.*

Because of the amount of pretrial publicity, the defense sought a continuance of the presentment before the Grand Jury to provide for a "cooling off period" on the grounds that no impartial panel could be seated. The *Daily Citizen–News* publish-

ed an article about the motion brought by the "defense lawyers who succeeded in obtaining a gag order preventing lawmen from talking about the murder."

The trial court heard the motion on October 10. The defense called media witnesses and proffered media stories and broadcasts about the case. An attorney form Dalton testified:

Q. [H]ave you heard, or come into contact with individuals who have made statements to you concerning the alleged homicide of Demetra Parker?

A. Yes, I've come in contact with a number of people—surprising to me. I have not seen ... this before since I've been here, the apparent coverage that this incident has received and the public interest ...

I haven't run into anybody that did not appear to have reached a conclusion. I have run into responses ranging from: "Why give these people a trial?" to "They should be lynched." And numerous—in the conversations, numerous admissions by people that they felt that this case had received such coverage that it would be very difficult to find an impartial jury.

*See* Transcript of October 10, 1980 hearing at 32–33. He also believed there was an inflammatory atmosphere about the case:

A. Yes, ... because ... the remarks that I have heard from good people, ... ranging from: "How in the world can an attorney defend these people" ... from the Editor of our local paper, ... and then the remarks that I've heard when I go to buy gasoline, ... "There's just no sense in going through a trial on this case", ... "These people are just ... guilty, and why are we wasting our time and the Court's time?"

*Id.* at 35–36. He felt that community sentiment against the Buttrums was "gaining in intensity." *Id.* at 36. Deputy Sheriff Jerry Shoemaker testified as to why special security measures were needed:

Because of the ill feelings that the people of this county have toward the Buttrums. People have came [sic] up to me and asked if there was any way possible, you know, just to rush in the jail and get to 'em, you know, "when you going to take 'em to Court", and all that good stuff, you know, things like snipers, or something of that nature.

*Id.* at 40. He testified he was aware of 12 to 15 threats against the Buttrums lives. "But, ... people come up to you usually everywhere you go, since you wear the uniform, people want to know about the Buttrums, you know, they already have their mind made up that they're guilty." *Id.* at 43.

The Court nevertheless denied the motion to continue the presentment to the Grand Jury to allow a cooling off period.

A few days later, the *Daily Citizen–News* reported that the Grand Jury had indicted Danny and Janice Buttrum for the murder and recounted the details of the crime. The *Valley Observer* published a back front-page story headlined "Portrait of the Accused." The article cast Janice Buttrum as being the dominant personality of the couple and as being uncaring about her legal plight:

They sit lonely in the courtroom these two. Surrounded by a table full of attorneys, they remain lonely. There is no family there to support them. They have only each other. Who could blame even a mother for not being there.

As their fate is argued, as motions are presented and technicalities discussed, they seem to be elsewhere, most of the time. Whispering between themselves, giggling even. They seem to be unaware of the seriousness of their plight.

Guilty or innocent, they stand accused of one of the most heinous crimes in the history of Whitfield County—the brutal, [sic] torture, sexual abuse and murder of a young woman.

She does the talking. He nods or frowns in response. She carries the conversation. He listens. She runs her mouth. He looks away. She dominates. He sits quietly. She scolds. He lowers his eyes. She instructs. He demures.

She is a big one. Even with the baggy institutional overalls rolls of fat bulge. Her brown hair is unkept. Scraggly

even. Her face is plain. Colorless. Her bottom lip is somewhat larger than the other. Her eyes are small, close together. Emotionless, until she laughs at her own joke.

. . . . .

It continued:

Seemingly, they are both oblivious of the court proceeding. Never asking question of their attorneys. ... A whirlwind storms around them and they display outward calmness.

Is it they do not understand that the State is trying to take their lives? Or do they care? could it be their lives have been so miserable they secretly wish for death?

Or are they just stupid?

. . . . .

Is that the fear in his eyes? The fear not of death or dying, but the fear that he will not die.

The fear that the Book is right. You can cry out for death and it will not come. The fear of Eternal Damnation. The fear of the Abyss.

On October 16, the court held a hearing on whether to lift the gag order. The court indicated it believed that there was little about the case not already known and that the gag order motions had "done more to create publicity that they have not." Respondent's Exhibit 13 at 33. The next day the *Daily Citizen–News* and the *Chattanooga Times* reported on the hearing and reviewed the details of the crime.

The Court lifted the gag order on October 17 and released for public inspection most of the preliminary hearing transcript, with the defendant's post-arrest statements omitted. The *Daily Citizen–News*, the *Chattanooga Times*, and the electronic media all announced the judge's decision. A few days later, the *Daily Citizen–News* recounted on October 21 some of the evidence:

Screams of the dying 19–year–old Demetra Parker were heard by guests at the Country Boy Motel where her beaten and repeatedly stabbed body was discovered....

Questioning of motel guests secured witnesses who indicated Miss Parker screamed during a savage knife attack which left over 90 wounds, testimony in a preliminary hearing revealed.

The FBI took a statement from the Buttrums ... after their arrest.... Copies of the statements have never been made public and defense lawyers say they will continue to resist efforts to open hearings to the news media before a trial date is set.

The *Chattanooga Times* October 21 story about the preliminary hearing revealed several additional facts. It noted that the post-arrest statements of the Buttrums were deleted from the transcript "apparently in anticipation of defense motions to keep information on confessions by the couple from the jury." It also revealed the following:

[Detective] Gribble said he interviewed Leon Busby, who had gone for a ride with the couple the day before the slaying. When Buttrum was questioned about his wife's reaction to statements that he was looking for a woman with whom to spend that evening, the man reportedly made a statement indicating that his wife was bisexual, according to the testimony.

Radio station WBLJ aired a lengthy newscast on October 21 summarizing the evidence at the preliminary hearing, including that the Buttrums made statements to the authorities during their first days in custody, that the day before the murder they had been seen trying to pick up two to three girls, that Busby had been told by Danny Buttrum that his wife would not mind because she was bisexual, and that the Buttrums became suspects because a search of their room suggested that they had checked out while having paid rent for 3 or 4 more days.

From November through January 1981, the Buttrums were in Milledgeville, Georgia, undergoing psychiatric evaluation. The media continued to report on the case. At least six stories, by the *Daily Citizen– News*, the *Chattanooga Times*, the *Chattanooga News–Free Press*, and the *Valley*

*Observer* printed articles on the coming competency hearing and repeated the details of the crime. The *Valley Observer* published a long article entitled "Portrait of the Accused: Crime Was 3 Months Ago, But Suffering Still Lingers."

It hurts Euell Anderson to even look at his mother. To see the blank stare on her face. It hurts almost as much as what happened to his "baby sister," but not quite. What happened to her still heaps spiritual coals on the soul of Anderson. The pain gnaws at his heart and has destroyed his mother's ability to function.

Euell Anderson is the brother of Demetra Parker.

The article described Anderson's trip to Georgia "ten hours behind the killers and ... heavily armed"; how he traveled to Pensacola and drove his sister's car home; and how he had visited with a Ouija board in the motel room where his sister died. It further described the impact on the family:

The fear of being alone is not the only problem the family faces.

"Through it all my mother was strong," Anderson said. "She amazed us all. It was incredible. She was the one worried about everybody else. She tried to pull us up and hold us together emotionally.

"She made it almost all the way through. At the casket, she lost it. She broke down. She lost it and I don't think she will ever get it back again. She just sits there and stares. I don't think that she will ever be capable again.

When she was young her father was killed in a brutal axe slaying," Anderson said. "A year ago, she lost two brothers in automobile accidents within six months of each other. And now this. It destroyed her."

"Sometimes I wish that they had come up to Tennessee and stuck a knife in my mother," he said. "Sometimes, I think it would have been easier on her than what she is going through now."

Anderson also spoke in grief about his sister, including,

"My mother raised Demetra right.

\* \* \* \* \* \*

"She had Demetra scared of sex. I believe Demetra was a virgin."

*Inside Detective* sold over 100 copies in Dalton of an issue with a feature story on the case. The story titled "The Girl Next Door—Knifed Ninety Times," presented a gruesome account of the discovery of the body, the crime scene and the arrest of the Buttrums: "The sheriff winced at the sight on the floor and called it the most brutal murder he had ever seen in Whitfield County." Coroner Helton knelt at the body, looked up and said, "stab wounds ... God knows how many." The story detailed the arrest of the Buttrums and stated that each "allegedly confessed to the murder."

### The Competency Trials.

In early February, the *Chattanooga Times* reported on the competency hearing of Janice Buttrum. An article of February 6 reported on Janice Buttrum's early life. "[T]eachers and social workers described Mrs. Buttrum's life from the time she was born and given by her mother to another woman for rearing until she left Bartow County, Ga., as the wife of Danny Buttrum, with whom she is charged with the brutal, sexual torture-murder of Demetra Faye Parker."

Other social workers and teachers described how Mrs. Buttrum as a young child came to live with her foster mother and the foster mother's friend in a one-bedroom travel-trailer that was, during the social workers' visits, littered with garbage, dirt and beer bottles.

The article noted that the only witness who testified that she was incompetent, was a social worker who told the jury she was "'a very disturbed child' who had already retreated 'into her own little world.'"

The *Daily Citizen–News* in a front-page story reported February 6 that Buttrum had been found competent to stand trial. It noted she was then expectant and that defense witnesses traced her early childhood,

testifying that she once went to bed with two 27–year–old men when but 14 years

of age because of being starved for affection.

The *Chattanooga Times* and the *Chattanooga News–Free Press* reported on the result of the hearing on February 7, the *Chattanooga Times* reminding the readers that "the Buttrums ... are accused of stabbing Miss Parker 95–100 times, that shortly before the murder Danny Buttrum had escaped from jail, and that the two were staying at the motel where Miss Parker's body was discovered at the time of the murder."

On February 11, the *Chattanooga Times* summarized the evidence at Danny Buttrum's competency trial:

> Three years before he was charged with the brutal sexual-torture-murder of a 19–year–old West Tennessee woman, Danny Buttrum checked into a regional psychiatric facility in Rome, Ga., and told officials he was preoccupied with sex and was afraid he would rape someone, according to testimony at Buttrum's competency hearing Tuesday.
>
> Evelyn Buttrum, the defendant's mother, testified Tuesday that her son was an alcohol abuser and suffered from "spells" during which he became violent and destructive.
>
> She acknowledged to District Attorney Steve Williams that Buttrum had even attacked her with a butcher knife and scissors.
>
> Jessie Collette, a former counselor at the regional mental health center, interviewed Buttrum when he was voluntarily checked into the hospital and said the defendant told him he had a preoccupation with sex and an urge to rape. Buttrum also reported homicidal feelings toward his mother.

The *Daily Citizen–News* published a similar story. WTVC Channel 9 reported that the jury took less than one hour to find Buttrum competent and reminded the viewers that the victim had been "raped ... and then stabbed almost a hundred times." WBLJ radio also reported the verdict and reported on the evidence suggesting that Buttrum "kept having ideas about raping someone." On February 13, the *Daily Cit-*

*izen–News* and the *Chattanooga Times* published additional stories on the hearings.

*Pre-trial Motions.*

Within a week, the local media informed Whitfield County of the next developments in the case. A *Daily Citizen–News* story of February 24 reported that the court had held a hearing on a motion for change of venue. *See* Respondent's Exhibit 17. At the hearing, the court permitted the defense to question three of its witnesses who had recently been called for jury service. The first witness revealed that she held opinions that Danny and Janice Buttrum had stabbed Ms. Parker, that she could not recall a crime which received more publicity in Whitfield County, and that her opinions were firmly held. Two other witnesses expressed similar views. The court refused to allow the defense to call any other of the 43 subpoenaed witnesses. The parties then entered into a stipulation:

> "[T]he balance of the 43 ... subpoenaed witnesses will have an opinion that Danny and Janice Buttrum were guilty, or at least involved in the killing of Demetra Faye Parker, and certain facts that have been brought out in the newspaper, television, and radio, but that probably they can set aside if they were called as Jurors in the case."

Respondent's Exhibit 17 at 72–73.

Articles on the hearing followed. The *Chattanooga Times* on February 25 summarized the hearing and noted:

> The murder of Miss Parker has become Whitfield County's most infamous crime in recent years. The former Beauty pageant contestant had moved from near Dyersburg, Tenn., to work in Dalton-area carpet mills several months before her semi-nude body was found in a motel room she had rented.
>
> An autopsy showed that Miss Parker had been stabbed 95–100 times and had been sexually molested, police said.

On February 25 the *Daily Citizen–News* published an article on the denial of the motion to quash the indictment reported

that $28,000 had already been spent on the defense.

Danny Buttrum's trial was set for March 9, and the court held final motions hearings on March 5 and 6. Evidence was presented at a hearing on a motion for change of venue. Tom Manton, a law student, testified by affidavit. He stated he had heard it said that (1) "part of the uterus of Demetra Parker was found in [her car] after the killing," (2) "Janice Buttrum ate part of the uterus of the victim," (3) "chunks and strips of the victim's body were missing and may have been eaten by the Buttrums," and (4) "a hot curling iron was inserted into the victim's vagina." *See* Defendant's Exhibit 9 to March 6 Hearing.

Lawrence E. Noble, Jr., a professor of political science and expert in media content analysis, also testified at the hearing for the defense. Respondent's Exhibit 23, Defendant's Exhibit 8 to March 6 Hearing. He testified that he reviewed a large amount of the pretrial publicity and was familiar with the Chattanooga media area from work on other cases. According to Dr. Noble, the Whitfield County media audience receives radio material from four local stations, television material from Dalton, Chattanooga, and Atlanta stations, and newspaper material from Dalton, Chattanooga and the Atlanta newspapers. In the 27 news days covered by the media information provided to him, "prospective jurors in Whitfield County would have been exposed to some 650 television station newscasts, and some 550 radio newscasts, ... and some 162 newspaper stories about the case for reading by the prospective jurors." He noted that the community received at least two special media events—the "seven minute piece on the case done by Channel 5 in Atlanta" and "a detective magazine story about the case which circulated in the county." *Id.*

He concluded that because of the nature of the crime and the extent and character of the publicity, the case should be tried in a venue "not contaminated by a combination of media from Atlanta, Chattanooga, and Dalton." He found the media content very heavy and extensive for a sustained period in the county, which caused the facts of the case to become saturated into the residents of the county. He explained that over a period of time coverage becomes cumulative because as new events are reported, the background events are repeated again and again. "The content of the coverage is in effect drilled into the knowledge of the prospective jurors." *Id.* at 2. He found that several factors of the case lent the case to emotional and inflammatory reporting:

> The heinous nature of the crime ... by its very nature resulted in sensational, emotional and inflammatory reporting. In addition, the fact that the victim was an attractive, All–American young woman produced an emotional focus on the victim. Other sensational aspects of the case included the interstate hunt for the defendants, the fact that they had their baby with them during the incident, the jail attack of one defendant, the apparent attempted suicide of one defendant, the gag order ... the insanity defense and the competency issue.

*Id.* at 3. Noble thought that these factors would have an especially marked impact on a community like Whitfield County.

> The bizarre circumstance of married defendants, one allegedly bisexual, sexually molesting a young woman described as beautiful, naive, and trusting is highly inflammatory in a jurisdiction of the traditional nature as Whitfield County. In such a homogeneous community the shared basic values of persons who are prospective jurors would naturally be outraged by such an extraordinary event. The tendency to get the culprits would be particularly strong. Results of jury research which show that some forty percent of the citizenry feel that indictment is presumptive evidence of guilt would no doubt apply in a higher percentage in such a venue with such a relatively homogenous population.

*Id.* The language used by the media would have increased the strength of the opinions developed by its consumers:

> Terms used in the media describing the crime include: brutal; sexual torture;

some one hundred wounds; mutilated; sex murder. These emotive figures were repeated over and over.

In this case, the media consumer in the county, a high percentage of which are prospective jurors, were showered with inflammatory material that had a high likelihood of causing opinions to be formed about the guilt of the defendants. *Id.* Finally, Noble found that "jurors often are not aware of the degree to which their opinions about guilt have been influenced by the media, and further that prospective jurors responding to the authority figure of the judge are not apt to reveal their full feelings about their pretrial exposure. . . ." *Id.* at 4. He concluded that "prospective jurors in a jurisdiction so thoroughly contaminated with pretrial publicity have too heavy a burden to bear to meet the demands of impartiality." *Id.*

Maureen McLaughlin, a jury consultant, concurred in the conclusions of Dr. Noble. *Id.*, Defendant's Exhibit 9 to March 6 Hearing. She testified that jurors are not aware of how much preconceived opinions about a case affect their judgment. Based upon the extensive amount of pretrial publicity in the Buttrums' case, she concluded, it would be very difficult for jurors to put aside their preconceived views. *Id.* at 56.

The court ruled that it would allow sequestered voir dire on the publicity issue but made no final ruling on the motion for change of venue.

On March 6, the *Daily Citizen–News* reported that Danny Buttrum's trial was scheduled for the following Monday, March 9. The article reviewed the latest events and recounted many of the details about the crime. On the eve of trial, the *Chattanooga News–Free Press* published a long story, summarizing many of the events of the preceding seven months and reviewing the details about the crime.

*The Trial of Danny Buttrum.*

The publicity most prejudicial to Janice Buttrum's trial was that covering her husband's trial. The media reported Danny Buttrum's confessions which in great detail told how the pair committed the crime and often cast Janice as the more perverse of the pair.

The first account was from the *Daily Citizen–News* on March 9: "Testimony is not expected to begin until Tuesday in the trial of the rape and murder of the Tennessee teen-ager as an expert opposing the death penalty is helping the defense." It noted that television stations from Atlanta and Chattanooga were covering the jury selection and included a sketch artist representing Channel 2 in Atlanta.

The *Atlanta Constitution* on March 10 published a long article that depicted a small community deeply upset about the death, "Girl's Slaying Stirs Anger, Shock In N. Georgia Town."

Today didn't come soon enough for some residents of this carpet mill town that sits in the shadow of Lookout Mountain.

"If this thing had happened 40 years ago, folks would have gone and got them out of the jail and made sure justice was done quick," explained the grizzled cashier of a self-service gas station. "And I'd have been with them. . . ."

"The tragedy that led to this day has had tongues wagging and tempers "hot hereabouts for half a year now."

In addition to profiling Demetra Parker as a shy, modest, pretty teen-ager, who sang in the choir, the story also recounted the crime, the arrest, the prior record of Danny Buttrum, his escape from the work camp, and that it had become evident that "Janice Buttrum—who could face execution if convicted—was pregnant." It outlined the prosecution's theory of the case, including that the Buttrums "wrestled [the victim] to the floor, [and] stabbed her. She was repeatedly raped while still alive and bleeding. Then the Buttrums took her car and drove to Florida." All of the media followed the voir dire carefully, and at its conclusion noted that the court denied the motion for change of venue.

*March 11.*

The *Daily Citizen–News* reported on March 11, "Danny Buttrum today admitted to stabbing Demetra Parker numerous times in her motel room and having sex

with her as [the court] ruled his confession could be admitted into evidence." It reported the contents of the confession:

Buttrum said "this person went to the room of Ms. Parker and asked for a cigarette," FBI Agent Fred McFall testified, noting that a baby was carried into the room after they forced their way past the 19–year–old victim.

Buttrum maintained that he was told while being questioned by FBI agents that his wife was "spilling her guts" about the murder and their statements were inconsistent.

Agent McFall said Buttrum indicated he entered the room, his baby was placed on the floor of the victim's motel room, and he took turns stabbing the teen-ager while having sex with her.

He said, "the other person" had oral sex after removing Miss Parker's underclothing.

"I went to the bathroom to wash off the blood," he was quoted as saying in the sworn statement. "I stuck a hard object up her vagina," he said in the confession.

WDEF TV–12 and WTVC also reported on the confession. WBLJ radio aired a long newscast summarizing in detail the testimony on March 11. It noted that Danny Buttrum confessed that "Janice went to Parker's room around 4:00 am Sept 3rd, to ask for a cigarette. She had her 19 month old child with her. When Parker opened the door—Danny forced his way in knocking Parker to the ground."

Janice then allegedly got a pocket knife and repeatedly stabbed Parker in the chest. Then in turn Danny allegedly did the same. Janice then told him that she would like to perform sexual activities with Miss Parker—allegedly according to the testimony—she did. Danny is then said to have raped her and went to the bathroom to wash the blood from his body. When he returned Janice was repeatedly stabbing Demetra Parker over & over. Danny then did the same and then forced a ridged yellow object into her feminine parts.

Testimony given by Dr. Metcalf revealed 67 stab wounds to the chest area, 24 to the neck, 3 in the side of the neck, a long gash in her lower abdomen, stabs in the stomach, one long cut on the groin.

*March 12.*

With the trial in full swing, every medium gave detailed accounts of the preceding day's events. The *Daily Citizen–News* on March 12 recounted the previous day's testimony in an article titled, "3 Approached Before Parker." The story detailed the findings of the pathologist, describing the wounds, and noting that Danny Buttrum had attempted to pick up other women earlier that evening.

The agent said Buttrum confessed that his 19–year–old wife produced a pocket knife and began the stabbing before removing the victim's clothing and talking of having oral sex with the girl.

. . . . .

[District Attorney] Williams indicated that the accused murderer tried to get two other girls to date him [earlier that evening] and was asked if his wife was jealous.

Buttrum responded that Janice Buttrum wouldn't mind if she could have her own sexual pleasures first with the women, Williams told jurors his case would prove.

The story also reported in detail the findings of the pathologist, including his removing the seven-inch long plastic toothbrush holder from the dead girl's body, which Williams should be termed "a parting savage gesture of her killers." It further noted that "the pretty Kenton, Tenn., teenager was still alive as numerous knife thrusts and slashes were made by intruders." The pathologist was reported having concluded that Ms. Parker was conscious through most of the attack.

The *Chattanooga News–Free Press* also published an article on March 12 headlined "FBI Agent Says Buttrum Confessed Murder." It detailed the findings of the pathologist, noting the depth of the wounds, the finding of teeth wounds on Ms. Parker's neck, a "gaping hole" across her abdomen, that the doctor was of the opinion that the

young woman died either after or at the very end of the stabbing, and that she was alive when she was raped and sodomized. WTVC TV–9 in Chattanooga and WQTM radio also aired reports about the confession.

*March 13.*

On this day, the prosecution and the defense completed their cases, and the jury began deliberations. Coverage was comprehensive. The *Daily Citizen–News* ran another front page story headlined, "Former Cellmate Tells of Confession." The article reported the testimony of two women who had been approached earlier by Danny Buttrum the night of the crime. It recounted a confession made to a cellmate, Hugh Don Smith:

> Smith said Buttrum had blurted out details of the brutal murder in a call [sic] they shared and indicated he became jealous because Janice was bisexual and spent time at a laundry with the victim.

> Demetra Parker allegedly kicked and screamed but Buttrum put his hands over her mouth and held her down while his wife stabbed the victim, Smith said the accused killer told him.

> He said they repeatedly stabbed the helpless girl because they feared she was still alive, Smith quoted Buttrum saying.

> Smith said the Buttrums allowed their 18–month–old baby to watch the events inside the room while concentrating on the victim, Buttrum was quoted as telling him.

The story also described the loss felt by Demetra Parker's family and boyfriend.

The *Atlanta Journal* published a story, "Inmate Says Man Admitted Slaying Teen," which quoted Smith extensively. The *Chattanooga News–Free Press* similarly reported Smith's testimony: "Buttrum Cellmate Tells of Bizarre Murder." The additional details of this article revealed that Buttrum " 'made his wife go' to Miss Parker's room and knock on the door under the pretext of borrowing a cigarette." "Smith said Buttrum told him that 'he [had] told her (his wife) to take a knife out of his pocket,' and when she did she stabbed Miss Parker in the chest."

The two argued about who would sexually abuse the victim first, according to Smith. He said that Buttrum began sexual intercourse with her while his wife "was propped up on her elbow beside them."

Smith said Buttrum told him Buttrum and his wife then had oral sex with the woman.

"He stated that he got up to go into the bathroom to wash the blood off him. While he was in there, he said he heard his wife molesting and stabbing her.

Before the pair left the room, Smith said Buttrum told him he had sodomized the victim and they had slit her throat "because his wife said 'I don't think she's dead yet.' "

*Id.* The *Chattanooga Times* reported an equally graphic account, adding that at the end of the affair, " 'he said his wife said "I don't believe she is dead yet." . . . and slit her throat.' " It reported Smith testifying, " 'I . . . asked Mr. Buttrum about his child,' Smith said. 'He said, "Oh, our child was there watching us. We had our child with us." ' " *Id.*

WQMT radio reported the day's events, and noted that defense counsel admitted Buttrum had killed Demetra Parker, but that the killing was spontaneous. It reported the District Attorney asked the jury to find Danny Buttrum guilty "not only to avenge the death of Ms. Parker but to do so out of fairness for her parents who were present in the courtroom." That night, WDEF TV–12 informed viewers that the jury had reached a guilty verdict in just fifteen minutes.

*March 14.*

On March 14, under a banner headline, "Buttrum Found Guilty," the *Daily Citizen–News* published two stories, one summarizing the trial to date and looking toward the sentencing phase, and the other about the family of Ms. Parker: "Next Step For Jury Is to Decide Price Buttrum Must Pay," and "Family Remembers Demetra." In recounting the day's events, it noted that

> District Attorney Steve Williams thundered in reply that Buttrum was like a

shark feeding in a tank and acting with a sexual frenzy when he helped stab Demetra Parker 97 times and raped her. The story pointed out that Williams asked the jury to consider the pain of Ms. Parker's family during its deliberations.

Ray Parker, the girl's father, bowed his head and wept as Williams pointed to him in the courtroom and noted that murder had taken a daughter that couldn't be replaced. The article on the family recounted with pathos the grief and loss the father, the mother, and the family.

The *Atlanta Journal* published a story on March 14 summarizing the trial, headlined "Buttrum Found Guilty of Murder and Rape."

In the six months since the nude and bloody body of Miss Parker was found in her $50–a–week room at the Country Boy Inn, the slaying has been a frequent topic of conversation in this north Georgia carpet-mill town. The courtroom was crowded each day of the trial as farmers in bib overalls, secretaries in high heels, teen-aged girls in jogging suits and an assortment of other spectators listened to the grisly story.

It noted that the "Buttrums confessed to the crime shortly after they were captured in Demetra Parker's car." It reported that Ms. Parker's father "hung his head and wiped tears from his ruddy cheeks" as the District Attorney told the jury that "this man will never again know the love of his daughter," and that while several members of the Parker family attended trial, the victim's mother "just couldn't bring herself to come over."

The *Chattanooga Times* and the *Chattanooga News–Free Press* published similar articles on March 14. On its 6:00 news program, WTVC TV–9 from Chattanooga reported on the progress of the sentencing trial. Near the conclusion of its newscast, a late bulletin was broadcast:

Late word just in from Dalton ... the defense team has introduced a letter written by Danny' wife Janice ... in which she admits she forced Danny to take part in the crimes.

According to the letter, read to jurors ... jealousy was the motive. And she ... quote ... loves him too much to let him die.

Late that night WQMT radio reported that the jury deliberated only 35 minutes before returning a death sentence. It also reported that defense lawyers had introduced a letter from "Danny's wife Janice, saying she was responsible for the crime."

*March 15.*

In its March 15 story, the *Chattanooga News–Free Press* reported on the events of the previous day in an article headlined "Mrs. Buttrum Letter Denies Spouse's Guilt." The article recounted the contents of the letter "absolving her husband of all responsibility in the ... slaying." It quoted Janice in the letter, "I killed Demetra Parker as an act of jealousy. I was afraid he (Danny) was having sex with her ... she was prettier than I was.... I made Danny do everything ... my husband is guiltless." WTVC TV–9 summarized the trial in a final report on the jury's decision. "Jurors went along with prosecutor Steve Williams ... who argued for the death penalty saying depraved is a weak word for how the defendant acted.... What does society need with a pervert coward like Danny Buttrum?" He argued that Janice "admitted she forced Danny to take part [and] told jurors Danny was a ticking time bomb ... which his wife knew how to detonate." Other electronic media also broadcast reviews of the week-long trial.

*March 16.*

On March 16, the print media published their concluding stories on the trial. The *Daily Citizen–News* published a front page story announcing the verdict, "Buttrum Receives Death Penalty." The story gave extensive coverage to the letter of Ms. Buttrum. "She claimed 'unwarranted jealously' ... prompted her to use her influence to get her husband to rape and kill the helpless teen-ager...." The article also identified each juror who sat on the case.

The *Chattanooga News–Free Press* published a story, headlined "Automatic Appeal Likely To Delay Buttrum Death." It

informed readers that the execution date would be postponed due to mandatory appeals. The report revisited the evidence at trial, including that "Buttrum had signed a confession and had admitted he and his 19–year–old wife had killed the young woman." It quoted the district attorney's comments about the verdict:

"I'm very proud of it. I think the people of Whitfield County were as outraged as I was. It was a horrible crime."

The *Chattanooga Times* story also reviewed the major points of the trial in a March 16 story, "Buttrum Gets Death in Chair."

*April—July 1981.*

With the conclusion of Danny Buttrum's trial and Janice over six months pregnant, proceedings against Ms. Buttrum were suspended to await the birth of her second child. The media continued to report on each development during the interim.

In May, the *Daily Citizen–News* reported on Danny Buttrum's hearing on his motion for a new trial, "Judge Denied Request for New Buttrum Trial." The article reviewed the grounds for the new trial, including the failure to grant a change of venue, and reminded readers that Janice Buttrum's trial was set for August. It also reported that "[t]he last death sentence returned in Whitfield County was in 1965 when Freddie Roach was convicted of abduction and rape at knife point of a 24–year–old woman."

One week later, the *Daily Citizen–News* reported that Danny Buttrum again attempted to win a new trial, claiming that not he but only Janice had stabbed the victim.

Buttrum said he shouldn't be facing a death sentence because it was his wife and not him who actually stabbed a 19–year–old West Tennessee girl, Demetra Parker, to death.

Janice Buttrum, the convicted Adairsville man's expectant wife, is still awaiting delivery of a baby before facing a murder trial this summer.

A few weeks later, on June 5, Whitfield County residents learned that Ms. Buttrum had given birth to a baby girl: *Daily Citizen–News*, "Police Guard Buttrum;" *Atlanta Constitution*, "Woman Facing Murder Trial Has Baby." On July 2, the district attorney announced that a trial date of August 24 had been set. WBLJ radio reminded listeners that Janice's husband had already been convicted and sentenced to death.

On July 22, the *Daily Citizen–News* published a story informing readers of the 200 citizens called for jury service for the final week in August, "200 Persons for Jury; Buttrum Case Scheduled." The story reminded readers that Janice Buttrum's husband had been convicted and sentenced to death for his role in the case.

*August 1981.*

With Ms. Buttrum's trial only a few weeks away, defense counsel filed another round of motions. One sought to recuse Judge Pannell, another to quash the magistrate fee system. In a front page story, the *Daily Citizen–News* reported on both motions, "Buttrum Attorneys Ask Judge Removal." The article characterized the crime as a "torture-murder," a "brutal stabbing murder," and the victim's body as "battered." The *Chattanooga Times* also covered the filing of the motions, "New Judge Sought For Buttrum Trial." WBLJ aired a similar story on August 12.

On August 13, the media again reported on the pending motions: *Daily Citizen–News*, "Motions Hearing Today;" *Atlanta Journal*, "Judge Asked To Quit Slay Case." On August 14, under a banner headline, "Pannell Won't Step Aside," the *Daily Citizen–News* reported that the judge would not recuse himself and described Ms. Buttrum's appearance at the hearing.

On August 20, the *Daily Citizen–News* published another front-page story on several pending motions, "Defense Motions Denied." The story, as did other similar articles, reported about the status of Ms. Buttrum's children. The following day, the *Chattanooga News–Free Press* published a similar story, titled, "Mrs. Buttrum's Trial Set for Monday In Whitfield."

2. Analysis of the Pretrial Publicity.

In examining a claim that prejudicial, pretrial publicity so inflamed and saturated the community that prejudice of the jury should be presumed, the Court must examine the totality of the circumstances surrounding the petitioner's trial. *Coleman,* 778 F.2d at 1538 (citation omitted). No single factor is dispositive, and the Court must weigh each element of the pretrial publicity, taking into consideration its pervasiveness and how it contributed to the totality of the circumstances. *Id.* Although Whitfield County residents were exposed likely to several sources of publicity, including newspaper, radio, television, and word-of-mouth, "no one person would have read, for example, all of the newspapers summarized in this opinion," and the overwhelming cumulative weight must therefore be discounted for this fact. *Id.*

Whitfield County residents were exposed to extensive prejudicial publicity for an entire year prior to Janice Buttrum's trial. Long before trial, the media reported that the Buttrums were apprehended the day after the murder in Pensacola with the victim's car. They had lived a few doors from the victim in the motel and had checked out several days early. Danny Buttrum was a recent escapee from a work camp, and Janice had helped him escape. The couple had confessed to the FBI after their arrests. Inmates attacked Danny in the jail, and he attempted suicide. Busby reported that when the Buttrums went looking the night before the murder to pick up girls, Danny said Janice wouldn't mind if she could enjoy the girl first. In one article, Janice was portrayed as the dominant personality of the pair based upon their interactions in the courtroom. The competency hearings revealed that Janice was raised in wretched, filthy conditions, and had slept with two men at the same time when she was only 14. Years before, Danny Buttrum had admitted he was preoccupied with sex, had strong urges to rape, had homicidal feelings toward his mother, and had attacked her with scissors and a butcher knife.

The publicity most prejudicial, as in *Coleman,* was an accomplice's confession. Danny's confession graphically described the horrible details of the rape and murder by the pair. The couple took turns stabbing the victim. Janice had oral sex upon the victim after she had been stabbed repeatedly. The baby was present in the room. The testimony of Hugh Don Smith reconfirmed this account. Finally, there was Janice's letter, in which she took full responsibility for the crime and absolved her husband of all wrongdoing. Accounts of Danny's trial were disseminated through all of the media throughout Whitfield County. This publicity alone presented "an overwhelming showing in the press of [Janice Buttrum's] guilt before [her] trial ever began." *See Coleman,* 778 F.2d at 1538.

Media accounts also often focussed on All–American qualities of the victim, the suffering and loss of the family, including the prior tragedies of the victim's mother.

Further, there were the erroneous rumors in the community that Janice Buttrum had eaten part of the victim's uterus, that chunks and strips of flesh were missing from the body and were presumed to have been eaten by the Buttrums, and that a hot curling iron was inserted into the victim's vagina. While not published in the media, these rumors reveal the sensational and macabre view much of the community held of the case.

In addition, in this case, there was direct testimony about the community feeling in the case. Members of the community were quoted by lawyers and a deputy sheriff as stating that a trial was a waste of time. An expert in media analysis and a jury consultant testified that no impartial jury could be seated on the case in Whitfield County. This testimony went uncontroverted: The prosecution offered no evidence to rebut this evidence of community of prejudice.

The picture that emerges is that of a community saturated with prejudicial and inflammatory publicity and predisposed as to the Buttrums' guilt. Under such circumstances, it would be unlikely to think that Janice Buttrum "received an impartial

assessment of [her] guilt or innocence on the basis of the evidence and the detached weighing of aggravating and mitigating circumstances which the Georgia death penalty system contemplates." *Id.* at 1539.

The showing made by Petitioner Buttrum is equal to that made in *Coleman* and *Rideau.* Whitfield County was larger than Seminole County (the venue in *Coleman* ), but is was much smaller than Calcasieu Parish (the venue in *Rideau* ). And similar to *Rideau* and *Coleman,* here, the media disseminated essentially verbatim a confession about the crime, that of the petitioner's own husband. As in *Coleman,* many of the widely publicized facts were inadmissible at Janice Buttrum's trial and sentencing, such as the personal qualities of the victim and the effects of the murder on the victim's family. In consideration of the totality of the circumstances, the Court concludes that the "petitioner has adduced evidence of inflammatory and prejudicial pretrial publicity that so pervaded the community as to render virtually impossible a fair trial before an impartial jury." *Coleman,* 778 F.2d at 1540. The Eleventh Circuit has held that " 'where a petitioner adduces [such] evidence ... [jury] prejudice is presumed and there is no further duty to establish bias.' " *Coleman,* 778 F.2d at 1490, *quoting Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir.1980).

### 3. Rebuttal of the Presumption of Prejudice.

There remains the question of whether the presumption of prejudice can be rebutted. While the Court has found no binding authority that such a presumption can be rebutted, there is dicta in *Coleman* and in *Mayola* to that effect. Assuming there could be such rebuttal, the court in *Coleman* examined the voir dire and found the presumption not rebutted. *Coleman,* 778 F.2d at 1541–43 & n. 25. The court however expressly declined to decide whether there could be rebuttal in an appropriate case. *Id.* at 1541 n. 25.

This Court concludes that the respondent should have the opportunity to rebut the presumption of prejudice, for if it can be shown that despite the saturation of the community with inflammatory publicity the trial court succeeded in seating an impartial jury, there is no reason for upsetting the verdict. The burden nevertheless will be heavy. In *Mayola,* in *dicta,* the court explained:

> Although the state's burden would be very difficult to carry, it would not be insurmountable. Of course, it could not be satisfied merely by the juror's assurances on *voir dire* of their own impartiality. [citation omitted.] On the other hand, a showing that none of twelve jurors impanelled had ever been exposed, first or second hand, to the inflammatory publicity, would probably suffice to negate the presumption of prejudice flowing from that publicity.

*Id.* at 1001.

The burden is heavy because of the difficulty in determining prejudice by asking the jurors themselves whether they can lay aside their preconceived opinions. In *Irvin,* the Court found prejudice despite the fact that every juror questioned positively stated that he or she could render an impartial verdict. *See id.,* 366 U.S. at 720, 724, 81 S.Ct. at 1641, 1643. "[A] 'juror is poorly placed to make a determination of his own impartiality. Instead the trial court should make this determination.' " *Jordan v. Lippman,* 763 F.2d 1265, 1274 (11th Cir.1985) (citation omitted).

Since *Mayola,* however, the burden has been lightened somewhat. The Supreme Court in *Patton v. Yount* held that the trial court's determination of the impartiality of a juror is a finding of fact entitled to the presumption of correctness of 28 U.S.C. § 2254(d). *Id.,* 467 U.S. 1025, 1036–37, 104 S.Ct. 2885, 2891–92, 81 L.Ed.2d 847 (1984).

In this case, the presumption of prejudice is rebutted by the voir dire. The voir dire, while not perfect, was adequate to unearth the prejudice of the venirepersons, and the errors made by the court were not so serious as to vitiate the presumption of correctness accorded the trial court's findings. Perhaps the most important factor that distinguishes this case from *Coleman* and *Irvin,* is that, here, individual jurors were questioned in sequestration. This was ap-

propriate and made more likely the jurors' candor. *See Irvin*, 366 U.S. at 728, 81 S.Ct. at 1645; *Patton v. Yount*, 467 U.S. at 1036, 104 S.Ct. at 2891; *Coleman*, 778 F.2d at 1542.

A review of the voir dire of the jurors who sat on Buttrum's case supports the trial court's finding that, while all of the jurors had some knowledge about the case, and several had formed beliefs or opinions about certain aspects of the case, the empaneled jurors were able to lay aside any preconceived opinions and render their decision based solely upon the evidence adduced at trial. In *Irvin*, the Court explained as follows:

> It is not required ... that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity and scarcely any of those best qualified as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence or an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if a juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 722–23, 81 S.Ct. at 1642 (citations omitted).

In this case, every juror who sat on the case stated unequivocally that he or she could lay aside any preconceived opinions and decide the case based solely on the evidence presented. While not dispositive of the issue, the unequivocal answers lend support to the trial court's finding. *See Yount*, 467 U.S. at 1039, 104 S.Ct. at 2893.

All of the jurors had been exposed to the publicity to some degree, but the amount of exposure varied widely. The jurors' testimony reveals little or no passion or inflamed feelings about the case. A year had passed since the crime was first reported and five months since Danny Buttrum's trial. *Cf., Yount*, 467 U.S. at 1032–35, 104 S.Ct. at 2889–91. Moreover, of the seven jurors with the greatest exposure, four expressed skepticism about what is reported in the media.[3]

Only one juror, Juror Ten, stated that she had an opinion that Janice Buttrum was guilty. Her testimony far exceeds any of the other jurors in approaching entrenched bias. If examining her testimony in the first instance, this Court would have excused her for cause. Nevertheless, her

---

**3.**

Juror One:
> I'll tell you my comment. When I read it, and in the paper what I read, that our experience with the newspaper, you don't know what to believe and what not to believe. That's—you can be at a meeting one night, and the next day read the report and, I'm sorry, you don't know that you were at that same meeting. Now, that's been our experience.

Respondent's Exhibit 2 at 222. Juror Two:
> Well, I don't think that I have enough facts, that I know whether I could say she was tortured or not. I don't think that any of the facts have been presented to me. I read something in the paper but, like I said—we were involved in something last week and there was an article in the paper that was totally wrong, you know. So, I'm well aware that things are written, but as far as my belief, I don't think I have a firm belief, because I don't have any actual ... I don't have the facts. ...

*Id.* at 231–32. Juror Nine:
> It stated she was [stabbed]; that's all I can base it on. The paper stated she was, and that was it. You read a paper and, of course, I work in a paper, and you learn to read parts of it and you don't really form an opinion from what you necessarily form—whether it's gospel truth or not, what you read in the paper. I hate to say that about the newspaper, but—
>
> . . .
>
> It stated in the paper that she was stabbed a number of times. Whether she was or not, I don't know.

*Id.* at 827. Juror Eleven:
> Let me answer it in this manner: I guess going through life in cases of any nature you read in the—accounts you read in the newspaper of hear on the radio, you discard—I would say I discard ninety-five (95%) percent of it. ...

*Id.* at 947.

testimony does not show opinions so entrenched as to overcome the presumption of correctness that must be accorded the trial court's finding. *See* 28 U.S.C. § 2254(d)(1)–(8).

Because her testimony is by far the most questionable, it is reviewed herein in detail. Juror Ten stated she read the paper almost every day and had read most of the articles about the case, "because I think everybody would have read it because it was front page news." She read about "when they sentenced [Danny Buttrum]," but nothing about his trial. She had the opinion that Demetra Parker had been stabbed, did not know whether she was raped, and had the opinion that she was tortured. She had talked about the case only to her family and did not know if she had expressed any opinions to them. She had the opinion that Janice Buttrum was involved in the matter but did not know whether she was guilty "until [she] heard the evidence."

Q. [D]o you feel like that you would have any trouble laying [what you've read and absorbed] aside and going into the Courtroom and making a decision based solely on that evidence?

A. I think I could do that, yes.

Q. Do you feel like that you would have any problem doing that?

A. No.

\* \* \* \* \* \*

Q. Do you believe that you could clearly distinguish in your mind, put in one pot over here the things that you've read, and make a separate distinction as to things that you heard?

A. Uh-huh, yeah, I understand. Yes, I could.

Q. Because of this opinion that you presently hold now, do you have any leanings toward who you think should prevail, or win in this case?

A. No, I do not.

She stated she had no opinion about what the sentence should be "until [she heard] the evidence." But she said yes to whether she had told anybody what she thought ought to happen in the case:

Q. And can you recall what you might have expressed?

. . . . .

A. You mean, whether or not I think she's guilty, or—

Q. Right, that's part of it?

\* \* \* \* \* \*

A. At the present time, without any evidence, I fell like she is.

\* \* \* \* \* \*

The Court: Ms. Hughes, is there any doubt in your mind that you could listen to the evidence, regardless of any thing you may have read or heard or have an impression about, an not let anything . . . you previously read and heard sway you in any way?

A. Yes, I could.

The Court: All right, is there any doubt in your mind of your ability to do that?

A. No, none whatever.

The Court: Have you got any desire right now for either side to win, over the other side?

A. Well, I said I'd formed an opinion, so I guess I do have.

The Court: Well, the way I understood your answer, Mr. Fain asked you the question: What do you think now? Now, the way I understood your answer was: Based upon what you'd read so far, you believe her to be guilty. But, now, do you—as you sit here now, have you already made a decision about the case.

A. No.

The Court: Well, do you . . . have an opinion, or are you just saying what you think about what you've heard so far?

A. I don't understand what you mean.

The Court: I know, . . . it gets all tangled up in all these questions. Do you feel like you've got a firm fixed opinion right now as to what ought to happen in this case?

A. Yes, I believe I have.

The Court: Did you have that before you came to Court?

A. Uh-huh. Court has changed it some.

The Court: How is that?

A. Well, I can understand there's two sides to it.

The Court: Well, do you think going through this voir dire process has reinforced the opinion you had, or lessened the opinion you have?

A. I guess it would lessen the opinion I have.

The Court: Do you think they'd have to overcome that opinion?

A. No, I don't think so.

The Court: Do you think you can put all that out of your mind and start fresh?

A. Uh-huh.

The Court: Is there any doubt that you could do that?

A. No, none whatsoever.

The Court: Could you base any decision that you might have to make solely upon the evidence you'd hear in Court and arrive at a verdict based on that evidence, as applied to the Law as Charged by the Court?

A. Yes, I could.

The Court: You think you could do that regardless of anything you may have read or heard, and not let anything you've previously read or heard sway you?

A. Uh-huh.

The Court: Is there any doubt in your mind as to that ability?

A. No sir, no doubt.

The Court: I find the juror qualified.

Respondent's Exhibit 2 at 843–53.

While this Court views with some skepticism her attestations of her capability to lay aside her opinions, in cases of ambiguity, the Court must defer to the finding of the state court. *See Yount*, 467 U.S. at 1040, 104 S.Ct. at 2893. That finding was not without adequate factual support in the record, 28 U.S.C. § 2254(d)(8), or flawed for any of the other reasons set forth in § 2254(d)(1)–(8).

Petitioner contends that the voir dire was inadequate for two basic reasons. First, the trial court restricted defense counsel from asking open-ended questions about what the jurors had read or heard. This limitation forced the voir dire to be con-

ducted through leading questions only. This was error. There is no reason why counsel should not be allowed to inquire with open-ended questions into what the jurors had heard. The *Jordan* Court explained:

> The court should [determine] what in particular each juror [has] heard or read and how it affected his attitude toward the trial, and ... [determine] for itself whether any juror's impartiality had been destroyed.

*Jordan*, 763 F.2d at 1274 (citation omitted). The court there held that the absence of a probing voir dire that focussed upon what each juror had been exposed to an how the exposure would affect their impartiality denied Jordan his right to an impartial jury. *Id.* at 1281; *see also Coleman*, 778 F.2d at 1543 & n. 26 (criticizing "conclusory" voir dire questions).

Nevertheless, while not permitting open-ended questions, the trial court in this case did not limit the range or scope of the leading questions, and a review of the entire 1222–page transcript of the voir dire, shows that counsel was permitted to inquire as to whether jurors had heard reports or held opinions essentially about any fact of the case. Thus, while it was error to limit the voir dire to leading questions, the error did not prevent the defense from examining in detail the jurors' exposure to the media and their opinions.

Second, Buttrum contends that the court began each individual session with an improper instruction. Initially, defense counsel was prevented from asking the jurors whether based upon what they had read or heard, they had formed an "opinion" about particular aspects of the case. The court erroneously ruled that such questions were tantamount to asking them to "prejudge" the case. *See* Respondent's Exhibit 2 at 151–61. The court decided to give the following instruction:

> Let me explain something to you right here. When the attorneys or I ask you about opinions and beliefs and stuff like that, make sure—there's a difference between reading something and remembering it, and reading or finding out about

something and making it your opinion or belief. Now, make sure that distinction, as to whether it's just something you read or heard, or whether you've got a firm, fixed opinion. Respondent's Exhibit 2 at 238–39. Defense counsel objected to this admonishment on that ground that it had a "chilling effect upon the Juror, in the sense that it perhaps instills in their mind the impression that having an opinion is incorrect and improper." *Id.* at 321–22. Petitioner is correct that such an instruction would tend to communicate that having a firm, fixed opinion was incorrect or improper, as defense counsel objected. The very purpose of the voir dire is to determine the existence of such opinions. Nevertheless, the court soon began adding that there were no right or wrong answers and that the jurors should simply be candid in their answers. And before long, the Court was permitting and even insisting that counsel use the word "opinion" rather than "feeling" or "belief." Finally, it is apparent that the jurors did disclose when they had an opinion or a belief about the aspects of the case when inquired into by defense counsel.

In conclusion, the Court holds that while the voir dire was not without error, it was adequate to reveal the jurors who had entrenched opinions, and those twenty-four jurors were excused for cause. The one juror seated who had a firm, fixed opinion as to guilt positively affirmed she could lay it aside, and the trial court's finding of impartiality is entitled to a presumption of correctness. Her testimony reveals insufficient bias to overcome that presumption. The Court concludes that the respondent has overcome the presumption of jury prejudice. The voir dire shows that entrenched prejudice did not infect the jury which ultimately found Buttrum guilty and sentenced her to death.

Accordingly, the petition for the grant of habeas corpus relief on this ground is DENIED.

### B. The Charge to the Jury at Buttrum's Competency Hearing.

■ Prior to her trial, Buttrum requested a court-ordered evaluation of her competency to stand trial. After her psychological evaluation, the court empaneled a jury and held a hearing to determine her competency. In accordance with Georgia law, the court instructed the jury that Buttrum bore the burden to prove incompetency. Buttrum contends that the placement of the burden of proof on the defendant to prove incompetence by a preponderance of evidence is unconstitutional. Buttrum's contention is without merit.

The Georgia Supreme Court has held:

The trial on the issue of mental competency contemplated by O.C.G.A. § 17-7-130(a) is in the nature of a civil proceeding and the defendant has the burden to prove incompetency by a preponderance of the evidence.

*Partridge v. State,* 256 Ga. 602, 603, 351 S.E.2d 635 (Ga.1987).

This placement of the burden upon the defendant by the state legislature does not violate due process. *See Lowenfield v. Phelps,* 817 F.2d 285, 294–95 (5th Cir.1987) (declining to follow *United States ex. rel. Bilyew v. Franzen,* 686 F.2d 1238, 1246 (7th Cir.1982)), *aff'd on other grounds,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); *cf. Spencer v. Zant,* 715 F.2d 1562, 1567 (11th Cir.1983) (while not addressing a due process challenge to the placement of burden, the court held that "Spencer wholly failed to establish any substantial or *bona fide* doubt that he was competent to stand trial."), *on reh'g en banc, relief granted on other grounds, sub nom., Spencer v. Kemp,* 781 F.2d 1458 (11th Cir. 1986) (*en banc*); *see also Wallace v. Kemp,* 581 F.Supp. 1471, 1478 (M.D.Ga. 1984) (Georgia placement of burden on defendant not unconstitutional), *rev'd on other grounds,* 757 F.2d 1102 (11th Cir.1985); *contra, United States ex. rel. Bilyew v. Franzen,* 686 F.2d 1238, 1244–45 (7th Cir. 1982) (burden constitutionally required on the prosecution); *Brown v. Warden,* 682 F.2d 348, 351–52 (2d Cir.1982) (same), *cert. denied,* 459 U.S. 991, 103 S.Ct. 349, 74 L.Ed.2d 388 (1982). This Court adopts the reasoning of the Fifth Circuit in *Lowen-*

*field* and concludes that this issue is without merit.

■ Buttrum also contends that the trial court in its competency charge improperly characterized the issue as being one of sanity, rather than competency to stand trial, and that it generally confused the two issues. Taking the charge as a whole, however, it is clear that the court adequately distinguished between insanity at the time of the crime and competency to stand trial. The court charged:

> The issue in this case and the sole issue in this case, is whether or not the person charged in this Court with a criminal offense is, at the present time, suffering from a disease of the mind and is so far insane as to be unable to comprehend the proceedings and be incapable of conducting her defense if she were tried for the alleged offense. You are not concerned in this trial with guilt or innocence of any alleged criminal offense.

> . . . . .

> You are here in this case for the purpose of deciding whether or not a person charged in this Court with a criminal offense is, at this time, mentally competent to stand trial. The question is whether or not Janice Buttrum ... is at the present time, suffering from a disease of the mind and is so far insane or mentally incapable that she is incapable of understanding the nature and object of the proceedings against her.... This proceeding is not, in any sense, a criminal proceeding.... The sole question is whether or not she is now sane and mentally competent to be tried for a criminal offense, and the purpose of this proceeding and of your verdict herein shall be to answer that question.

Respondent's Exhibit 8, Transcript at 625–28. While the Court used the terms "sane" and "insane," it is apparent that a reasonable jury would have understood that the issue to be decided was the mental capacity

of the defendant to understand the nature of the proceedings against her and to assist in conducting her defense.[4] This issue accordingly is without merit.

C. *Justice of the Peace Billy Broom's Issuance Of the Arrest Warrant and Presiding Over the Preliminary Hearing.*

■ Justice of the Peace Billy Broom issued Janice Buttrum's arrest warrant, charging her with murder, and served as presiding judge at her preliminary hearing. Buttrum contends that these judicial acts were unconstitutional because he was at the time also a deputy sheriff. Second, she contends that he was operating within an unconstitutional "fee system" then in operation in Georgia.[5]

Respondent contends that the instant claim presents only a Fourth Amendment claim precluded from federal habeas review by *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). While these issues are not limited to Fourth Amendment concerns and are not barred by *Stone v. Powell,* habeas relief is not warranted because any error committed by Justice of the Peace Broom was subsequently corrected by the grand jury.

In *Vaughn v. State,* 160 Ga.App. 283, 284, 287 S.E.2d 277 (1981), the Georgia Court of Appeals overturned a conviction, finding that Justice of the Peace Broom was

> "per se" disqualified as a neutral and detached magistrate.... At the time of the issuance of the search warrant in this case, Judge Broom was ostensibly authorized to exercise both executive functions in his capacity as justice of the peace. This was not proper and negates any possibility of a finding that Judge Broom was a neutral and detached magistrate.

*Id.* at 284, 287 S.E.2d 277. This Court concurs in the decision of the Georgia Court of Appeals that Justice of the Peace

---

4. It is not surprising that the court employed the terms sanity and insanity because the Georgia plea of incompetency is labeled by the Georgia Code, "a special plea of insanity." *See* O.C.G.A. § 17–7–130.

5. This Court struck down this fee system in Georgia as unconstitutional in *Doss v. Long,* 629 F.Supp. 127, 130 (N.D.Ga.1985).

Broom could not act as a neutral and detached magistrate given his executive position as deputy sheriff. "Whatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from activities of law enforcement." *Shadwick v. City of Tampa*, 407 U.S. 345, 350, 92 S.Ct. 2119, 2122, 32 L.Ed.2d 783 (1972).

### 1. The Preliminary Hearing.

The Supreme Court has held that the preliminary hearing is a "critical stage" in the criminal process for purposes of the right to counsel. *Coleman v. Alabama*, 399 U.S. 1, 9–10, 90 S.Ct. 1999, 2003–2004, 26 L.Ed.2d 387 (1970). It follows that if the defendant is entitled to counsel, at a minimum he is entitled to a an unbiased decision maker. "The accused is as entitled at [a] preliminary hearing to an impartial decision maker as in a guilt trial." *Tucker v. City of Montgomery Bd. of Com'r.*, 410 F.Supp. 494, 506 (M.D.Ala. 1976) (Godbold, J., for three judge court) (holding unconstitutional Alabama fee systems for magistrates). Thus, Buttrum was denied due process at her preliminary hearing.

Buttrum contends that when a defendant is denied an impartial adjudicator reversal is automatic, *citing Rose v. Clark*, 478 U.S. 570, 579, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986) (biased trial judge). Petitioner cites no other authority for her position, and the Court has located none to the effect that such error *at a preliminary hearing* requires automatic reversal. *Rose v. Clark* and similar cases involved unbiased decision makers at trial.

The denial of an unbiased decision maker at a preliminary hearing is different. The function of the preliminary commitment hearing in Georgia is to determine if probable cause exists to authorize the keeping in custody of one accused of committing a crime, pending determination by the grand jury that probable cause exists for the suspect to stand trial. *Blake v. State*, 109 Ga.App. 636, 640, 137 S.E.2d 49 (Ga.Ct.App. 1964), *cert. denied*, 379 U.S. 924, 85 S.Ct. 281, 13 L.Ed.2d 337 (1964). Subsequently, the grand jury determines whether sufficient evidence exists to try the defendant, and a trial by jury determines whether the defendant has committed the crime alleged.

Given this procedure, a showing of prejudice is required before habeas relief can be granted on a claim of a biased adjudicator at a preliminary hearing. Otherwise a conviction would be set aside because of a tainted preliminary hearing even though subsequently a grand jury properly found sufficient evidence for the defendant to stand trial. Such a result defies common sense. It is true that the Supreme Court has held that the possibility of appeal is an inadequate remedy for a biased adjudicator at trial. *See, e.g., Ward v. Village of Monroeville*, 409 U.S. 57, 61–62, 93 S.Ct. 80, 83–84, 34 L.Ed.2d 267 (1972) ("Petitioner is entitled to a neutral and detached judge in the first instance."). Nevertheless, the grand jury examines the issue of probable cause *de novo*. The likelihood that it will cure any harm caused by a disqualified preliminary hearing judge compels a showing of prejudice before habeas relief may be granted.

In this case, Buttrum has alleged no impropriety or other error in the grand jury's determination that probable cause existed for her to stand trial. With no such error being shown or found by the Court, any harm sustained by the disqualified preliminary hearing judge was cured. This issue therefore is without merit.

### 2. The Issuance of the Arrest Warrant.

The claim that Buttrum is entitled to habeas corpus relief because of Justice of the Peace Broom's issuance of her arrest warrant resolves similarly. First, as contended by respondent, to the extent that the issue raises a Fourth Amendment claim, it is barred by *Stone v. Powell*. To the extent that the claim raises a Fourteenth Amendment issue, that the warrant was issued by a disqualified Justice of the Peace, it is dissolved by the preceding analysis. The purpose of having an arrest warrant properly issued is to ensure the existence of probable cause for an arrest. Subsequently, the grand jury determines, on evidence, that probable cause exists for

the defendant to stand trial. Accordingly, as with the preliminary hearing issue, any defect in the issuance of the warrant that violated due process requires a showing of prejudice to warrant the grant of habeas corpus relief. Buttrum has shown no prejudice, and this ground for habeas relief thus fails.

### D. The Brady v. Maryland Issue.

Buttrum originally contended that the prosecution had suppressed evidence favorable to her in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). She contended that the state had indicated that at least one of its witnesses had a prior criminal conviction, and the trial court did not require the state to disclose such information. During this habeas action, the Court ordered these documents turned over to the petitioner. After receipt of the documents, Buttrum admits she has no evidence of any *Brady* violation. This issue accordingly is without merit.

### E. The Admission of the Defendant's Post–Arrest Inculpatory Statements.

Buttrum contends that the trial court unconstitutionally admitted into evidence certain inculpatory statements made after her arrest. She contends her Fifth Amendment right to counsel was violated when incriminating statements were made after her arrest in the absence of a knowing and intelligent waiver of her right to counsel. Similarly, she contends her Sixth Amendment right to counsel was violated because additional statements were made in the absence of counsel after the attachment of her right to counsel. Both of these contentions are without merit.

#### 1. The Fifth Amendment Challenge.

■ The jurisprudence of the Fifth Amendment on the admissibility of custodial statements requires that a waiver of the Fifth Amendment right to counsel must be freely and voluntarily given, and must be knowingly and intelligently made. *See, e.g., Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979). The question before this Court is whether, as a matter of law, Petitioner Buttrum executed a valid waiver of her Fifth Amendment rights prior to making her post-arrest inculpatory statement.

The respondent incorrectly urges as conclusive the findings of the state habeas corpus court as to the voluntary and intelligent nature of petitioner's statements. While findings of fact made by a state court, generally, must be accorded a presumption of correctness by a federal habeas court, the issue of the voluntariness of a confession is a mixed question of law and fact for which the Court must make an independent inquiry. *Miller v. Fenton*, 474 U.S. 104, 112, 106 S.Ct. 445, 450, 88 L.Ed.2d 405 (1985); *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1977); *Williams v. Johnson*, 845 F.2d 906, 909 (11th Cir.1988).

A confession is voluntary if, under the totality of the circumstances, it is a product of free and rational choice. *Paxton v. Jarvis*, 735 F.2d 1306 (11th Cir.), *cert. denied*, 469 U.S. 935, 105 S.Ct. 335, 83 L.Ed.2d 271 (1984). A confession is not voluntary if it is extracted through use of improper influence, such as threats or violence or is obtained by promises. *Harris v. Dugger*, 874 F.2d 756, 761 (11th Cir.1989).

The petitioner, who has the burden of proof, has failed to establish that her post arrest confession of September 4 was given in violation of her Fifth Amendment rights. A pretrial suppression hearing revealed the following facts: After the murder, the petitioner and her husband took the victim's car and drove to Pensacola, Florida. Upon learning of the Buttrum's likely destination, the G.B.I. secured an unauthorized flight complaint from the United States Attorney's Office in Atlanta, and a U.S. Magistrate issued an arrest warrant for the Buttrums. Immediately upon her arrest, Janice was advised of the murder charges against her, Respondent's Exhibit No. 21 at 33–36, and of her Miranda rights, Respondent's Exhibit No. 3 at 1293. Three law enforcement officers were present at the time. *Id.* at 1294. The arrest and admonishment of rights occurred at ap-

proximately 10:00 a.m. on the morning of September 4, 1980.

Buttrum was then transferred to the custody of F.B.I. Agent Sammon for transport to F.B.I. headquarters in Pensacola. During this trip petitioner said nothing. *Id.* at 1313. On arriving at F.B.I. headquarters, Buttrum was again orally advised of her rights, by Agent Sammon, and informed of the charges against her. In addition, she was provided with an "Advice of Rights Form" which she read and signed. The time was approximately 10:55 a.m. Agent Sammon testified that neither he nor anyone else to his knowledge promised her anything, nor did anyone threaten her or hold out any hope or reward to her *Id.* at 1314–15.

Though petitioner insinuates that she did not understand the content of the Advise of Rights Form, that position is not supported by the testimony. The following colloquy occurred between the prosecution and Agent Sammon during the suppression hearing:

Q Now did you go through the [Advice of Rights] form with her?

A Yes sir.

Q And how did you do that?

A I asked her to read the form, and there was some question in my mind whether she actually understood it, so I read to her thereafter.

Q Did you ask her if she understood it?

A Yes sir, I did.

Q What was her reply?

A She said she did.

*Id.* at 1313–14. On cross-examination Sammon was questioned further:

Q [Y]ou had a question about whether or not she understood it; is that correct?

A There was a question in my mind as to whether or not she understood it.

Q Okay, was she able to read the words?

A Yes sir.

Q Okay. May I Ask: What raised the question in your mind about her understanding it?

A Just the—she read it too quickly, I thought. And I asked her did she understand it, and she told me she did. And I said, "Well, would you like me to read it to you?" And I did.

. . . . .

Q Okay. Did she have any questions about it at all?

A No sir.

*Id.* at 1323–24.

An additional officer, Sergeant Knowles, was present and witnessed Petitioner Buttrum sign the "Miranda Form." After signing the form, Buttrum was questioned. During this initial interrogation petitioner said she knew nothing about the murder. She stated that she and her husband had travelled to Pensacola in a car belonging to a friend of her husband's. *Id.* at 1316. After approximately one hour of questioning by Agent Sammon and Sgt. Knowles, an additional agent entered the room and joined in the questioning at around 11:50 a.m. *Id.* at 1297. At this time she made inculpatory statements, admitting her participation in the murder. Sammon testified that he wrote out the petitioner's statement and went over it with her before she signed it. *Id.* at 1319. Moreover, he testified that before writing a sentence, that he would ask Ms. Buttrum if what he was about to write was correct. If she responded affirmatively he committed it to paper. *Id.* at 1328.

This Court finds no evidence to conclude that the trial court erred in admitting the September 4 statement. All the evidence indicates that Buttrum made an intelligent and knowing waiver of her Fifth Amendment right to counsel before giving the incriminating statements. Accordingly, this issue is concluded to be without merit.

2. The Sixth Amendment Challenge.

■ Petitioner also asserts that the Sixth and Fourteenth Amendments required the suppression of inculpatory statements of September 5, 1980. On that date as well, Buttrum implicated herself in the murder, and her statement was introduced into evidence. Petitioner contends that

when this statement was made, the state had committed itself to prosecute her for murder, her right to counsel accordingly had attached, and interrogation in the absence of counsel was thus improper.

■ It is well settled that "absent a valid waiver, the defendant has the right to the presence of an attorney during any interrogations occurring after the first formal charging proceeding, the point at which the Sixth Amendment right to counsel initially attaches." *Moran v. Burbine,* 475 U.S. 412, 425, 106 S.Ct. 1135, 1142, 89 L.Ed.2d 410 (1986); *United States v. Gouveia,* 467 U.S. 180, 187, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984). The Sixth Amendment right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant. *Gouveia,* 467 U.S. at 187, 104 S.Ct. at 2297; *Estelle v. Smith,* 451 U.S. 454, 469–70, 101 S.Ct. 1866, 1876–77, 68 L.Ed.2d 359 (1981); *Kirby v. Illinois,* 406 U.S. 682, 688–89, 92 S.Ct. 1877, 1881–82, 32 L.Ed.2d 411 (1972); *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). A waiver of the right must be knowing and intelligent, and the accused must be "sufficiently aware of his right to counsel" and "of the consequence of a decision to forgo the aid of counsel." *Patterson v. Illinois,* —— U.S. ——, ——, 108 S.Ct. 2389, 2394, 101 L.Ed.2d 261, 272 (1988).

Petitioner strenuously contends that her Sixth Amendment right to counsel attached upon her appearance before the federal magistrate on September 4, 1980, in Florida. As a result, she maintains, the September 5 statement was inadmissible at trial because it was made without the attendance of an attorney for the accused. Assuming *arguendo* that her right to counsel had attached at the hearing before the magistrate, her Sixth Amendment argument still must fail.

The Supreme Court in *Patterson,* held that where the defendant is admonished with Miranda warnings after the right to counsel attaches, and then voluntarily makes inculpatory statements, the statements need not be suppressed. *Id.* at ——, 108 S.Ct. at 2394, 101 L.Ed.2d at 272. The

proper execution of a valid waiver of those rights serves as a voluntary, knowing, and intelligent waiver of the right to counsel. *Id.* "The fact that petitioner's Sixth Amendment right came into existence ... does not distinguish [her] from the preindictment interrogatee whose right to counsel is in existence and available for his exercise while he is questioned." *Id.* at ——, 108 S.Ct. at 2394, 101 L.Ed.2d at 271. Thus, *Patterson* defeats Buttrum's argument that after the right attaches, any subsequent incriminatory statements made in the absence of counsel must be suppressed. A valid waiver makes such statements admissible.

Did Buttrum execute a valid waiver of her right to counsel before she gave her statements of September 5, 1980? On that date, Whitfield County officers travelled to Pensacola, Florida, to transport the petitioner and her husband back to Whitfield County. The officers took her in custody at 8:45 a.m. on September 5, 1980. Before beginning the trip back to Georgia she was advised of her Miranda rights by Agent Johnson of the G.B.I. Respondent's Exhibit No. 3 at 1336.

On arriving in Whitfield County, she was taken to the county jail for interrogation. *Id.* at 1339. Prior to questioning, Agent Johnson again informed her of her rights. He also produced a "Waiver of Rights" form, read it to her, and asked her to read it herself. *Id.* She replied that she knew her rights and then signed the form. *Id.* There is no evidence that Agent Johnson or anyone else made any threats or promises, or held out the hope of reward to induce her to sign the form. After signing the waiver form, she voluntarily admitted her role in the murder and that she felt no remorse about the death of Ms. Parker.

All the evidence indicates that Buttrum was fully aware of her rights prior to signing the waiver form. The waiver form indicated that she had a right to counsel and the right to refuse to answer questions or make statements without first consulting an attorney. She stated she fully understood her rights. No evidence suggests

that her confession was anything other than voluntary.

Accordingly, her confessions were properly admitted into evidence, and this ground of her habeas petition is without merit.

### F. The Admission at Trial of Extra–Judicial Statements of Danny Buttrum.

During the guilt phase of the trial, a prosecution witness, Leon Busby, who was an acquaintance of the Buttrums', was permitted to repeat a statement made by Danny Buttrum the evening of the crime while Busby and both Danny and Janice Buttrum were riding in his car:

A. [Danny] asked if I knew where I could get him a girl at.

Q. What did you reply?

A. I said, "Won't your wife get mad at you for talking like that?" "No, as long as she gets to go with her first."

Transcript at 1544. The trial court overruled the defendant's objection and denied the defendant's motion for a mistrial. The prosecution later used this testimony to argue to the jury that Janice Buttrum was not a mindless follower of her husband but planned to have sex with the victim.

Petitioner Buttrum contends this testimony was inadmissible hearsay, was "highly prejudicial," and violated her right to confrontation under the Sixth Amendment because it was not shown to be trustworthy and it precluded her right to cross-examine the declarant. In support she cites *Ohio v. Roberts*, 448 U.S. 56, 60, 100 S.Ct. 2531, 2536, 65 L.Ed.2d 597 (1980). In *Roberts*, an out-of-court declarant's statement was held admissible because it met strict standards of reliability and trustworthiness because it had been subject to cross-examination at a preliminary hearing. The respondent contends that Busby's testimony was admissible under an exception to the hearsay rule as a statement of a co-conspirator made in the defendant's presence, *citing Sprouse v. State*, 242 Ga. 831, 252 S.E.2d 173 (1979); *Birt v. State*, 236 Ga. 815, 225 S.E.2d 248 (Ga.1976), *cert. denied*, 429 U.S. 1029, 97 S.Ct. 654, 50 L.Ed.2d 632 (1976).

The Georgia Supreme Court so held in *Buttrum*, 249 Ga. at 654–55, 293 S.E.2d 334. Further, respondent contends that an improper admission of hearsay evidence warrants habeas relief only where the evidence was "material in the sense of a crucial, critical, highly significant factor." *Shaw v. Boney*, 695 F.2d 528, 530 (11th Cir.1983).

### 1. Analysis of the Issue.

■■■ In this case, the challenged statement was inadmissible because it lacked the necessary indicia of reliability required by the confrontation clause. While the Supreme Court has not indicated that the right to confrontation is exactly coextensive with the hearsay rules, it is rare that evidence which is not hearsay or is admissible under a hearsay exception is held violative of the confrontation clause. *Collins v. Francis*, 728 F.2d 1322, 1336 (11th Cir. 1984) (citation omitted), *cert. denied*, 469 U.S. 963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984). The crucial concern behind the confrontation clause is the "trustworthiness of [the] testimony." *Id.*

> Two requirements must be met ... before confrontation may be dispensed with. First, the prosecution must show that the out-of-court declarant is unavailable to testify despite its good faith efforts to obtain his presence at trial. Second, the prosecution must show that the out-of-court statements bear sufficient indicia of reliability to provide the jury with an adequate basis for evaluating their truth.

*United States v. Chapman*, 866 F.2d 1326, 1331 (11th Cir.1989), (petition for certiorari filed June 17, 1989), *citing, inter alia, Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539. Here, there was no showing of the unavailability of Danny Buttrum.

The second requirement—that the out-of-court statement bear sufficient indicia of reliability—presents more difficulty in this case. The Supreme Court has noted that reliability "can be inferred without more in a case where the evidence falls within a firmly-rooted hearsay exception." *Roberts*, 448 U.S. at 66, 100 S.Ct. at 2539.

In this case, the Georgia Supreme Court found the statement admissible under the Georgia co-conspirator exception to the hearsay rule. *See Buttrum*, 249 Ga. at 654–55, 293 S.E.2d 334; *see also Sprouse v. State*, 242 Ga. 831, 252 S.E.2d 173 (Ga. 1979); *Birt v. State*, 236 Ga. 815, 225 S.E.2d 248 (Ga.1976). Under the federal rule, however, the statement would not have been admissible. The federal rule, Fed.R.Evid. 801(d)(2)(E), requires that the statement be made during the pendency of the conspiracy: "A statement made by a co-conspirator is admissible if evidence independent of [the] hearsay statement[ ] shows that the conspiracy existed, that persons challenging admission were members of the conspiracy, and that the statement [was] made during the course of and in furtherance of the conspiracy. *United States v. Caporale*, 806 F.2d 1487, 1512, 1513 (11th Cir.1986), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987).

In this case, there was insufficient evidence that the statement was made during the pendency of a conspiracy. The evidence showed only that at the time the statement was made the Buttrums were riding around with Busby, going to get beer. No independent evidence suggested that the Buttrums had at that time entered a conspiracy to commit any crime.

Thus, the state rule allowed admission while the federal rule would not. In such a case, where "the state's co-conspirator exception is more expansive than the federal, the proper approach for federal courts on habeas corpus review" is to consider "whether the testimony meets the more general tests of reliability outlined in [the confrontation clause] opinions." *Park v. Huff*, 493 F.2d 923, 930 (5th Cir.1974), *cert. denied*, 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (1975).

The more general tests for reliability are the following:

(1) whether the truth of the out-of-court statements is corroborated by other evidence [citation omitted]; (2) the extent of the out-of-court declarant's personal knowledge of the defendant's identity and role in the crime; (3) the possibility that the statements are founded on faulty recollection; and (4) the circumstances under which the statements were made.

*Chapman*, 866 F.2d at 1330 (citations omitted).

The challenged statement in this case does not meet those standards of reliability because of the first and fourth factors. First, no other evidence corroborated the statement that Janice would not mind Danny picking up a woman as long as she could have sex with the woman first. And under the fourth factor, the circumstances undermined the statement's reliability. The statement could have been made in jest, or could have been a lie to persuade Busby to help Danny find a woman, and Janice could have been afraid to cross Danny and deny the statement. Numerous interpretations could be made from the statement. Cross-examination could have clarified the statement's ambiguity. It clearly lacked the necessary indicia of reliability required by the confrontation clause.

### 2. Harmless Error

In *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the court held that "the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman [v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)] harmless-error analysis." *Id.*, 475 U.S. at 684, 106 S.Ct. at 1438. The *Chapman* standard has most recently been stated by the Supreme Court as follows: A constitutional error may be held harmless "if the prosecution can prove beyond a reasonable doubt that [it] did not contribute to the verdict." *Satterwhite v. Texas*, 486 U.S. 249, ——, 108 S.Ct. 1792, 1796, 100 L.Ed.2d 284, 293 (1988). The Court must "make an intelligent judgment about whether the erroneous [comment] might have affected [the] jury." *Id.*, 486 U.S. at ——, 108 S.Ct. at 1798, 100 L.Ed.2d at 295.

Here, the prejudice of Busby's testimony far outweighed its probative value. *See Collins v. Francis*, 728 F.2d 1322, 1336 n. 12 (11th Cir.1984), *cert. denied*, 469 U.S.

963, 105 S.Ct. 361, 83 L.Ed.2d 297 (1984), *citing* 4 Weinstein's Evidence ¶ 801(d)(2)(B)[01] (1981) (in determining whether silence may be construed as adoption of statement of coconspirator made in defendant's presence, federal courts should make Fed.R.Evid. 403 prejudice evaluation).

The prejudice did not sufficiently infect the guilt-innocence phase to require a new trial, but it spilled over and contaminated the sentencing phase so as to require a new sentencing hearing. The evidence of guilt, that Janice Buttrum knowingly and intentionally participated in the murder of Demetra Parker, including the evidence of her confession, was overwhelming. Even absent the admission of the hearsay statement, the Court can confidently say, beyond a reasonable doubt, *United States v. Hasting*, 461 U.S. 499, 510–11, 103 S.Ct. 1974, 181–82, 76 L.Ed.2d 96 (1983), that the jury would have found her guilty of the murder of Demetra Parker.

The statement, however, prejudiced Buttrum in the sentencing phase. The defense at sentencing was essentially that Janice Buttrum, while participating in the murder, acted under the domination of her husband and played a less culpable role than he, one not warranting death. Busby's testimony implied that Janice Buttrum wanted to have sex with Danny's "pick-up" before Danny had sex with her. It portrayed her not as a dominated follower of her husband, but as a willing participant in a plan of perverse sexual activity that ultimately led to the death of Demetra Parker. Moreover, the statement portrayed her as having unusual or aberrant sexual desires. This portrayal was in accord with Dr. Adams's diagnosis of her as sexually perverted. It portrayed her as one with a "depraved" mind, which portrayal tended to satisfy the element of one of the aggravating circumstances, depravity of mind, argued by the prosecution for imposition of death. Further, it was the only evidence introduced by the state subject to interpretation that her participation in the murder may have been premeditated and not an act of passion or done under the domination of her husband. In this sense, the statement

was a "critical" and "highly significant factor." Its introduction therefore was not harmless beyond a reasonable doubt and requires a new sentencing hearing.

### G. The Admission of Gruesome Photographs.

■ Buttrum contends that the introduction of several gruesome photographs of the victim's body deprived her of her Eighth and Fourteenth Amendment rights. These photographs were introduced both at the guilt and penalty phases of the trial. Generally, the introduction of evidence involves only state law and is cognizable on habeas review only if it rendered the trial fundamentally unfair. *See Amadeo v. Kemp*, 816 F.2d 1502, 1504–05 (11th Cir. 1987) (citations omitted), *rev'd on other grounds, sub nom., Amadeo v. Zant*, 486 U.S. 214, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988). Buttrum contends that the photographs of the victim were unduly prejudicial and inflammatory and were not relevant to any issue of guilt or punishment.

■ For the sake of argument, the Court will assume that the introduction of the photographs was improper at the guilt phase of the trial because no issues were raised by the defense as to, for example, the cause of death, the repeated stabbing, Buttrum's participation in the murder, accident, etc. The gruesome nature of the photographs thus could only have inflamed the emotions of the jury. Nevertheless, the evidence of guilt in this case, including the petitioner's post-arrest confessions, was sufficiently overwhelming that the introduction of the photographs was not so prejudicial as to result in a fundamentally unfair trial.

■ Buttrum contends that the photographs also were not relevant to any issue of punishment. The respondent, however, correctly contends they were relevant to the aggravating circumstance that the murder was wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the vic-

tim.[6] O.C.G.A. § 17–10–30(b)(7). The photographs were clearly relevant to show the (b)(7) circumstance.[7] The location, number, and extent of the wounds were clearly relevant to these factors. Accordingly, habeas corpus relief is not warranted on this issue.

### H. *Prosecutorial Misconduct.*

Buttrum contends that several remarks of the prosecutor during closing argument violated her constitutional rights. She contends first that the prosecutor violated her Fifth Amendment right against compulsory self-incrimination by commenting on her right not to take the witness stand:

> Defense? There is none. There has not been one iota of evidence to indicate that this defendant did not do what she is charged with. . . .

Tr. 1713. She contends that this remark violated the rule that the prosecutor may not comment of the defendant's failure to testify during trial.

### 1. Legal Principles.

 The Fifth Amendment prohibition against compulsory self incrimination insures the right of all criminal defendants not to testify at trial. From this derives the proscription that the prosecution may not comment on its exercise. *Griffin v. California,* 380 U.S. 609, 611–15, 85 S.Ct. 1229, 1231–33, 14 L.Ed.2d 106 (1965). "Prosecutorial comment is improper if the defense can demonstrate either that '(1) the prosecutor manifestly intended to comment on the defendant's silence, or (2) that the character of the comment was such that a jury would naturally and necessarily construe it as a comment on the defendant's silence.'" *United States v. Griggs,* 735 F.2d 1318, 1322 (11th Cir.1984) (citation omitted). While it is improper for the prosecution to comment on the defendant's failure to testify, "it is not error 'to comment on the failure of the defense, as opposed to the *defendant,* to counter or explain the

evidence.'" *Id.* at 1321, *quoting United States v. Bright,* 630 F.2d 804, 825 (5th Cir.1980) (emphasis added by *Bright* court); *see also United States v. Johnson,* 713 F.2d 633, 650–51 (11th Cir.1983) (where defendants chose not to testify at trial but records available to the defense might have existed which would have contradicted the government's theory of the case, prosecutorial comment on the failure of the defense to produce any evidence or testimony in rebuttal to the espoused theory held permissible), *cert. denied, sub nom., Wilkins v. United States,* 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984). Nevertheless, "where the rebuttal testimony or evidence could come only from the defendant, a failure of the *defense* to present evidence is equivalent to the failure of the *defendant* to testify." *Griggs,* 735 F.2d at 1322 (emphasis in original); *see also Griffin v. California,* 380 U.S. 609, 610–15, 85 S.Ct. 1229, 1230–33, 14 L.Ed.2d 106 (1963) (comment on defendant's failure to provide evidence on matters that only he could have been expected to deny or explain violated 5th Amendment).

### 2. Analysis.

 In this case, the state habeas court found the following:

> The thrust of the prosecutor's case was that the Petitioner was an active, willing and aggressive participant in a conspiracy to commit murder. Through its line of questioning and cross-examination throughout the trial, the defense tried to show that the murder was planned and executed solely by Danny Buttrum. Thus viewed in the context of the charges against Petitioner, this Court finds that the prosecutor's statements were made for the purpose of arguing Petitioner's involvement in the crime.

Respondent's Exhibit No. 35 at 7. This finding of fact as to the prosecutor's purpose is entitled to presumptive weight by

---

6. *See infra* at Issue III.–G. for discussion of these factors.

7. The photographs were admissible under Georgia law. While Georgia law decries the use of autopsy photographs, it allows them, especially

when they do not depict the victim after autopsy incisions have been made. *See Brown v. State,* 250 Ga. 862, 867, 302 S.E.2d 347 (1983). The photographs in this case do not show such incisions.

this Court. 28 U.S.C. § 2254(d). This finding resolves the inquiry about the first possible basis for finding improper conduct: whether the prosecutor *intended* the statement as a comment on the defendant's right to silence.

The finding that the theory of the defense was that the murder was executed solely by Danny Buttrum, however, is not fairly supported by the record. 28 U.S.C. § 2254(d)(8). The defense was that while Janice Buttrum may have participated in the murder, she played a minor part and acted *under the influence of her husband.*

The second prong of the test for finding the comment improper is satisfied. The prosecutor's remarks "naturally and necessarily" would have been construed by the jury as a comment on Buttrum's failure to testify. The prosecution's most important and most damning evidence was Buttrum's confession. The jury would have expected that if any explanation of those extremely incriminating statements existed, Janice Buttrum would have been the one to give such explanation. Thus a comment on the failure of the *defense* to counter the prosecution's central piece of evidence would naturally have been taken as a comment on the *defendant's* failure to testify.

Further, the crime occurred in a motel room where only Janice and Danny Buttrum, their baby, and the victim were present. The defense never claimed Janice was not present in the room. If she had made such a claim, the prosecutor's comment might be taken as a proper attack on her defense, because the jury could assume that if she was not present at the crime, she would have presented alibi evidence. *See Duncan v. Stynchcombe,* 704 F.2d 1213, 1215 (11th Cir.1983) (prosecutor's comment that "there has been no evidence in this case from the defense at all that Duncan was not in that house" held a proper reference to failure of the defense to offer any alibi evidence as to the defendant's whereabouts at the time of the burglary). The defense here was that Buttrum played a more minor role and acted under the influence of her husband. The person who naturally would be expected to explain the role she played in that motel room was Janice Buttrum herself. The prosecutor's remarks thus "naturally and necessarily" would have been taken as a comment on her failure to testify. Accordingly, Buttrum's Fifth Amendment right not to be subjected to prosecutorial comment on her failure to testify was violated.

### 3. Harmless Error.

■ This conclusion, however, does not end the inquiry. The Supreme Court has held that such a violation of the defendant's Fifth Amendment right is subject to analysis of whether the improper comment was harmless beyond a reasonable doubt. *United States v. Hasting,* 461 U.S. 499, 507–512, 103 S.Ct. 1974, 1979–1982, 76 L.Ed.2d 96 (1983), *citing Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). The *Chapman* standard for harmlessness of a constitutional error has most recently stated by the Supreme Court as follows: A constitution error may be held harmless "if the prosecution can prove beyond a reasonable doubt that [it] did not contribute to the verdict." *Satterwhite v. Texas,* 486 U.S. 249, ——, 108 S.Ct. 1792, 1796, 100 L.Ed.2d 284, 293 (1988). The Court must "make an intelligent judgment about whether the erroneous [comment] might have affected [the] jury." *Id.,* 486 U.S. at ——, 108 S.Ct. at 1798, 100 L.Ed.2d at 295. In *Hasting,* the Court stated the test as, "absent the prosecutor's allusion to the failure of the defense to proffer evidence …, is it clear beyond a reasonable doubt that the jury would have returned a verdict of guilty?"

The test of whether a comment on the failure to testify might have contributed to a verdict requires a kind of post-hoc speculation many would consider to be of dubious dependability. Where the evidence of guilt is overwhelming the test is more easily applied. Here, Buttrum's confession presented overwhelming evidence of her guilt. But the confession may have been given undue weight if the jury concluded that her failure to explain her confession meant there was no explanation. Nevertheless, applying the *Hasting* formulation of the standard, the Court can say beyond

a reasonable doubt that absent the unconstitutional comment, given the strong evidence of the state, including Buttrum's confessions, the jury would have found her guilty of murder and theft by taking. This issue therefore does not warrant the grant of habeas relief.

The petitioner's challenges to other comments of the prosecutor have been carefully examined and determined to be without merit. While several constituted improper prosecutorial comment, viewed in the context of the entire trial, they were not so egregious as constitute a denial of fundamental fairness. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Brooks v. Kemp*, 762 F.2d 1383, 1400 (11th Cir.1985), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986). The strength of the evidence at trial left little doubt about Buttrum's participation in the crime. Absent these additional allegedly improper comments, it can be said beyond a reasonable doubt the verdict would have been the same.

### I. The Trial Court's Charge on Conspiracy.

Buttrum next contends that she was indicted for malice murder and theft by taking, but the trial court charged that the jury could convict on vicarious liability theories: conspiracy, aiding and abetting murder, and felony murder. She contends the court effectively amended the indictment from a murder count, to one much broader, in violation of her constitutional rights. She contends this Amendment deprived her of her right to notice of the charges against her and subjected her to conviction on a charge not made.

In its charge, the trial court defined conspiracy:

I will define what the Law means by "Conspiracy." A person is involved in a conspiracy to commit a crime when that person, together with one or more other persons, conspires to commit any crime, and that any one or more of such persons does an overt act to effect the object of the conspiracy. To show a conspiracy—

and I Charge you that it is sufficient for two or more persons, in any manner, positively or tacitly came [sic] to a mutual understanding that they will accomplish an unlawful design or a criminal act. Anyone after a conspiracy is formed who knows of its existence and purposes and joins therein becomes as much a party thereto as if he had been an original member.

Respondent's Exhibit 3 at 1740. Later, the court charged the jury that if they found the existence of a conspiracy, they were permitted to consider statements of any coconspirator of the defendant against her.

■■■■ An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by the prosecutor or the court after the grand jury has last passed upon them. *United States v. Salinas*, 654 F.2d 319, 324 (5th Cir. Unit A August 1981) (citation omitted), *overruled on other grounds, United States v. Adamson*, 700 F.2d 953 (5th Cir.1983), *cert. denied*, 464 U.S. 833, 104 S.Ct. 116, 78 L.Ed.2d 116 (1983). A constructive amendment to the indictment occurs where a jury instruction "so modifies the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment." *United States v. Lignarolo*, 770 F.2d 971, 981, n. 15 (11th Cir.1985), *cert. denied*, 476 U.S. 1105, 106 S.Ct. 1948, 90 L.Ed.2d 358 (1986); *United States v. Johnson*, 713 F.2d 633, 643 (11th Cir.1983), *cert. denied*, 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984); *see also Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

■■■ In this case, no constitutional error was committed by the charging court. "Statements of a coconspirator may be introduced into evidence even though the government has not charged [the defendant] with conspiracy[,] as long as the existence of the conspiracy has been properly established." *United States v. Salisbury*, 662 F.2d 738, 740 (11th Cir.1981), *cert. denied*, 457 U.S. 1107, 102 S.Ct. 2907, 73 L.Ed.2d 1316 (1982), *citing United States v. Freeman*, 619 F.2d 1112, 1123 (5th Cir.

1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981). If the trial court may instruct the jury that it may consider a coconspirator's statements if it finds a conspiracy, the trial court, *a fortiori,* must be permitted to define what is a conspiracy. No more was done at Buttrum's trial.

■ Similarly, a charge of aiding and abetting need not be specifically pleaded, since it is not a separate offense, and a defendant indicted for the substantive offense can be convicted as an aider and abettor upon proper demonstration of proof so long as no unfair surprise results. *United States v. Kasvin,* 757 F.2d 887 (7th Cir.1985), *cert. denied,* 474 U.S. 1032, 106 S.Ct. 592, 88 L.Ed.2d 572 (1985). Clearly the evidence in this case on the facts of the crime eliminated any possibility of surprise to the defense. Finally, the trial court made no charge on felony murder. Accordingly, the petitioner's attack on the jury charge is without merit.

### J. The Challenge to the Unified Appeal Procedure.

■ The Unified Appeal Procedure, O.C.G.A. § 17–10–36 (UAP), comprises rules promulgated by the Georgia Supreme Court that prescribe certain procedures utilized by the trial court, defense counsel, and the prosecutor prior to, during, and after trial. These procedures are intended to insure that all matters that could be raised by the defendant are raised, or are waived, to prevent and correct error in the proceedings, and to provide proper transcripts of these matters for utilization on the unified appeal of a death sentence. *See* O.C.G.A. § 17–10–36; *Unified Appeal Procedure,* 246 Ga. A–5 (Ga.1980). Much of the procedure entails holding hearings or conferences among the trial court, the defendant, defense counsel, and the prosecutor, which focus on various rights and matters that could be asserted by the defendant.

The Georgia Supreme Court has upheld this statutory scheme against constitutional attack both on its face, *Sliger v. State,* 248 Ga. 316, 282 S.E.2d 291 (Ga.1981), *cert. denied,* 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982), and as applied in this case, *Buttrum v. State,* 249 Ga. 652, 293 S.E.2d 334 (Ga.1982), *cert. denied,* 459 U.S. 1156, 103 S.Ct. 801, 74 L.Ed.2d 1004 (1983).

Buttrum presents the following alleged constitutional deficiencies in the UAP: that it abridged her right to due process by "upsetting the balance of power between the accused and the prosecution," that it abridged her right against self-incrimination, her right to counsel, and her equal protection rights through its selective application only to capital defendants.

Without expressing any opinion on the merit of these issues in a proper case, they are without merit in this case. Buttrum fails to show how any of these alleged violations caused harm that would warrant habeas corpus relief. None of the violations alleged are ones that merit habeas relief without a showing of prejudice from their violation. Few are the constitutional errors that permit such relief without a showing of harm. *See, e.g., Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (introduction of coerced confession); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (complete denial of right to counsel); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (adjudication by biased judge). Since Buttrum's alleged errors are not ones that permit relief without a showing of harm, and since she has alleged no harm, her attack on the UAP is without merit.[8]

### III. THE SENTENCING PHASE.

### A. The Constitutionality of Executing One Who Was Seventeen at the Time of the Crime.

■ At the time of the crime, Janice Buttrum was 17 years old. Evidence was submitted that she had the emotional matu-

---

**8.** The denial of a constitutional right itself may constitute harm and could perhaps be remedied in a civil rights action, but the violation of the rights asserted here without a showing of prejudice do not warrant habeas relief.

rity of one 12 or 13. She contends that killing her would be cruel and unusual because of her age and because, in the history of the United States, only 9 females who committed crimes before their 18th birthday have been executed. The last was in 1912. At present, of over 2,000 persons on death row, only two were minor females at the time of the crime.

These facts certainly suggest that the execution of Janice Buttrum would be "unusual." Nevertheless, the Supreme Court has foreclosed this issue by its recent decision, *Stanford v. Kentucky*, — U.S. —, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). There the Court held that it does not violate the Eighth Amendment to execute one who was 17 at the time of the crime. Buttrum cites no authority for her contention that her death penalty is unconstitutional because she was emotionally 12 or 13 at the time of the crime. This claim is foreclosed by the Supreme Court's decision that execution of those mentally retarded at the time of the crime is not *per se* unconstitutional. *See Penry v. Lynaugh*, — U.S. —, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

Buttrum also contends that her death sentence is cruel and unusual because she acted under the domination of her husband, eleven years her senior. Further, her history of repeated neglect and abuse by her parents, continuous childhood ridicule and abuse by peers, and involuntary commitment to state institutions without having committed any crime, she maintains, render her execution cruel and unusual. These facts, however, were properly presented to the jury at the sentencing phase of her trial in mitigation. No case has been cited, and none has been found, that holds that these mitigating factors can override the jury's decision and constitutionally prohibit her death. In accordance with the mandatory authority of the Supreme Court, this issue is without merit.

### B. The Admission of a Prior Uncounseled Conviction Without Prior Notice to the Defendant.

At the sentencing phase, after the defense examined its last witness, Janice Buttrum, the prosecution sought introduction of a prior conviction of hers for simple assault. She contends that its admission was unconstitutional, first, because the prosecution never gave prior notice of its intention to use it, as required by O.C.G.A. § 17–10–2, and, second, because it was a prior uncounseled conviction.

The first basis, that the introduction was in violation of O.C.G.A. § 17–10–2, is without merit. That statute provides that the prosecution must provide prior notice to the defendant of its intention to introduce any prior conviction of the defendant into evidence. *See id.* While the respondent contends this is merely a matter of state law, Buttrum maintains that when the state has provided for the imposition of criminal punishment subject to certain procedural protections, the violation of those protections rises above the realm of state law. The defendant has a legitimate expectation that punishment will not be meted out other than in accordance with those protections. She further contends that the Eleventh Circuit has held that O.C.G.A. 17–10–2 "promotes reliability by allowing the defendant time to prepare a defense to the prosecution's evidence." *Brooks v. Kemp*, 762 F.2d 1383, 1406 n. 36 (11th Cir.1985) (*en banc*).

Petitioner's argument is correct as far as it goes. But in this case the Georgia Supreme Court on direct appeal affirmatively held that the admission of the conviction was not in error since it was admitted as character evidence in rebuttal. *Buttrum*, 249 Ga. at 655–56, 293 S.E.2d 334. The court thus effectively held that the state procedural protection was not violated. This Court must defer to a ruling of the Georgia Supreme Court on an issue of state law. Buttrum's expectation that she would not be punished other than through compliance with that state procedural protection therefore was not frustrated. Because the statute was not violated, Buttrum's due process rights were not violated, and her argument is without merit.

■ Respondent has not addressed in its briefs the issue that the introduction of

the conviction was unconstitutional as an uncounseled conviction. Nevertheless, in this Circuit, it is not improper to introduce at the penalty phase of a criminal trial a prior uncounseled misdemeanor conviction where the defendant was not imprisoned. *See Wilson v. Estelle*, 625 F.2d 1158, 1159 (5th Cir.1980), *cert. denied* 451 U.S. 912, 101 S.Ct. 1985, 68 L.Ed.2d 302 (1981), *citing for comparison Baldasar v. Illinois*, 446 U.S. 222, 223–24, 100 S.Ct. 1585, 1585–86, 64 L.Ed.2d 169 (1980) (plurality opinion) (uncounseled misdemeanor conviction may not be used under an enhanced penalty statute to convert a later misdemeanor into a felony with a prison term); *see also United States v. Peagler*, 847 F.2d 756, 757–79 (11th Cir.1988); *Thompson v. Estelle*, 642 F.2d 996, 998 (5th Cir., Unit A, April 1981). This issue therefore must fail.

### C. The Trial Court's Provision of Psychiatric Assistance and the Testimony of Dr. Adams.

Buttrum contends that the trial court violated her constitutional rights when it denied her funds to obtain private psychiatric assistance after the prosecution had obtained its own private psychiatric assistance. She also contends the testimony of the prosecution's psychologist at the sentencing phase of the trial violated her constitutional rights. The Court agrees.

#### 1. Factual Background.

Prior to trial, the defense filed a motion for funds for expert psychiatric assistance. It argued that counsel had no experience in locating and preparing witnesses for a death sentence penalty phase and that the testimony of psychological experts was essential. The defense submitted affidavits from three criminal defense lawyers with experience in capital cases who stated that access to private psychiatric services was indispensable to an effective defense in the case.

The court denied the motion and, instead, offered that Buttrum be evaluated for sanity and competency by doctors at state facilities. The defense responded that these would be inadequate because it needed "an extensive, clinical examination in an atmo-

sphere that is conducive to rendering appropriate medical results." Respondent's Exhibit 14 at 9. Also, the defense argued that such facilities, being state facilities, were probably "State or Prosecution oriented on the questions [at hand]." *Id.* at 10. Third, the defense expressed its concern about the lack of confidentiality because the psychiatrist-patient privilege did not apply in court-ordered evaluations. Nevertheless, having had the motion denied, defense counsel consented to the competency and sanity evaluations at state facilities. Buttrum was examined by Dr. Bullard at Northwest Regional Hospital in Rome, Georgia, and was evaluated for over two months at Central State Hospital in Milledgeville.

After she was found competent to stand trial, Buttrum unsuccessfully reasserted her motions for a comprehensive private psychiatric evaluation. Shortly before trial, the prosecution announced its intention to present at the penalty phase of the trial the testimony of Dr. Henry Adams, a psychologist from the University of Georgia. The prosecution filed a "Notice of Further Disclosure," and attached a letter from Dr. Adams which revealed Adams's opinion and expected testimony. Respondent's Exhibit 1 at 437–49. Adams's clinical impression was that of anti-social personality disorder, paraphilia, and sexual sadism. He characterized these conditions as including "stimulus hunger," a need of ever increasing stimulation and excitement, which in sexual matters often leads to sadism, "where they become sexually excited by the suffering and pain of others." He concluded: "There is little doubt that she is an extremely dangerous person, and that if she is released, the possibility of her committing similar acts is high." *Id.*

Upon receiving the notice, the defense immediately moved for a continuance and renewed its motion for funds to retain an expert who was a peer to Dr. Adams. The defense informed the court that the testimony of Dr. Adams could have a devastating effect on the outcome of the trial. It argued that the provision to the state of a specialist outside the state system without

providing the defense similar services denied fundamental fairness. The defense explained that it had spoken with the doctors involved in the competency evaluations but maintained that the defense needed and was entitled to the assistance of a private psychiatrist. The court voiced concerns about the expense involved. The defense argued that the prosecution was using public funds to hire its psychologist. The court denied the motion, indicating that the defense had available professionals in the state system.

At the penalty phase of the trial, the prosecution called one witness—Dr. Adams. Adams testified that he had written 10 books, published over 100 articles, many on sexual disorders, was a diplomate in Clinical Psychology, and had testified previously as an expert on sexual disorders. He testified that he had formed his clinical impression of Buttrum on the basis of the file of the case and the reports from the competency and sanity evaluations. Adams never interviewed Janice Buttrum.

In testimony, Adams repeated the clinical impression stated in his letter. He testified that Janice Buttrum was an anti-social personality, one who is impulsive, irresponsible, breaks the law, is in conflict with society's norms, may be sexually promiscuous, and occasionally "quite aggressive." And she was a paraphiliac, one who achieves sexual excitement from the pain and humiliation of a non-consenting adult. She was a sexual sadist, one with stimulus hunger, who is never satisfied sexually, who is "turned on" by causing suffering and torture to the victim, and "[w]hen the disorder really becomes severe, they may torture, kill, mutilate their victims. It is a repetitive kind of activity that continues until the individual is apprehended or stopped in some way or another." Respondent's Exhibit 4 at 1814. Such forms of sadism usually manifest early, around puberty and often will increase in intensity, particularly when associated with the anti-social personality "so that they have to have more, and more, and more extreme forms of this activity in order to get excited or turned on." *Id.* at 1815. As to the potential for other acts, he testified that "[p]art of the definition of sexual sadism is repetitive acts; and yes, with this kind of diagnosis, it's kind of—you would expect it to continue." *Id.* at 1823.

The defense called a number of witnesses to describe Janice Buttrum's upbringing and troubled life but called no expert to express an opposing view to Doctor Adams's clinical impression.

In her state habeas corpus action, Buttrum introduced affidavits from three psychiatrists who evaluated Buttrum. All three disagreed strongly with Adams's opinion of future dangerousness and his diagnoses. Psychiatrist Jonas R. Rappeport, M.D., stated:

I further do not believe that it is possible within reasonable medical certainty to make such a long term future dangerousness prediction on an individual who is only 17 years old who has never been convicted of or admitted to participating in other serious violent anti-personal crimes. In fact I would even question the ability to make the diagnosis of anti-social personality disorder or paraphilia sexual sadism with any degree of certainty in an individual so young with this history. More importantly, I believe that it would be exceedingly difficult and not within reasonable medical certainty to make any such long term predictions or serious diagnoses without having interviewed the individual extensively.

Respondent's Exhibit 34 at 1–2.

Psychiatrist Robert L. Sadoff, M.D., also found Adams's clinical impression seriously flawed. He noted that by definition, a sexual sadist or paraphiliac is defined by repeated sexual aberrations. According to DSM III (Diagnostic and Statistical Manual, 3rd Edition—the American Psychiatric Association's authoritative reference source for diagnosis) there must be at least two or more occasions in order to call it repeated. No such repeated tendencies were present in Janice's case. Sadoff noted that the materials reviewed by Adams included "no indication that [Buttrum had] had prior aggressive or hostile sadistic sexual behavior." *Id.*, Affidavit of Robert L.

Sadoff at 3. He noted that "[Danny Buttrum's] history is replete with his concern about his sexual needs and his fear of urges of raping women. Janice's history is not replete with sexual problems or concerns of sexual violence." *Id.* at 4. He noted that DSM III reserves diagnoses of "anti-social personality" for "people who are 18 years of age or older." *Id.* Sadoff found it "inconceivable" for Adams to make "such a blatant statement about her 'dangerousness' and her probability of committing similar acts of this type." Respondent's Exhibit 34 at 42.

Gary E. Dudley, a clinical psychologist, interviewed Buttrum for three and one-half hours, performed numerous psychological tests, and reviewed all the material reviewed by Adams along with additional material on Danny Buttrum. He found Janice Buttrum to have poorly defined ego boundaries, to be easily influenced by the emotions and behaviors of others, especially those from whom she receives emotional support. *Id.* Affidavit of Gary E. Dudley at 5. She manifested "severe dependency conflict," and "[s]he subordinates her own needs to those of the person on whom she has become emotionally dependent." *Id.* at 6. He diagnosed her as suffering from antisocial personality disorder and dependent personality disorder but that her condition was treatable. *Id.* at 6, 9. He found *no* evidence that she suffered from any paraphilia disorder or sexual sadism.

### 2. Legal Principles.

In this federal petition for habeas relief, Buttrum relies principally on two Supreme Court cases, *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983), and *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), for her contention that the trial court's denial of funds for psychological assistance denied her constitutional rights. Specifically, she contends that it was unconstitutional to allow Dr. Adams's opinions of future dangerousness to stand unopposed by a defense psychologist.

In *Barefoot,* the petitioner claimed that the constitution forbids altogether the admission of psychiatric opinion of one's propensity for future dangerousness at the penalty phase of a capital trial. With the backing of the American Psychiatric Association, which argued that predictions of future dangerousness are wrong two-thirds of the time, he claimed that such opinion is unreliable and prejudicial. The Court rejected a per se exclusion of such testimony:

> We are unconvinced, however, at least as of now, that the adversarial process cannot be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness, particularly when the convicted felon has the opportunity to present his own side of the case.

*Id.* at 901, 103 S.Ct. at 3399. The Court concluded Barefoot never contended "the court refused to provide an expert for petitioner," *id.* at 899 n. 5, 103 S.Ct. at 3397 n. 5, and held that the admission of opinion testimony on future dangerousness does not violate the Constitution.

In *Ake,* the Court held that indigent defendants have a due process right to competent psychiatric assistance when an adequate showing is made that sanity will be a significant issue at trial. It further held that indigent defendants have the right to psychiatric assistance when the issue of future dangerousness is raised at the sentencing hearing. Where such issue is raised by testimony of a prosecution witness, the defendant must be provided a competent psychiatrist "who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." The Court reasoned:

> Psychiatry is not ... an exact science, and psychiatrists disagree widely and frequently on what constitutes mental illness, on the appropriate diagnosis ... on cure and treatment, and on likelihood of future dangerousness.

*Id.* at 81, 105 S.Ct. at 1095.

> This Court has upheld the practice in many States of placing before the jury psychiatric testimony on the question of future dangerousness, [citation omitted] *at least where the defendant has had access to an expert of his own.* [citation omitted.] In so holding, the Court relied,

in part, on the assumption that the fact finder would have before it both the views of the prosecutor's psychiatrists and the "opposing views of the defendant's doctors" and would therefore be competent to "uncover, recognize, and take due account of ... shortcomings" in predictions on this point. [citation omitted.] Without a psychiatrist's assistance, the defendant cannot offer a well-informed expert's opposing view, and thereby loses a significant opportunity to raise in the jurors' minds questions about the State's proof of an aggravating factor. In such a circumstance ... due process requires access to a psychiatric examination on relevant issues, to the testimony of the psychiatrist, and to assistance in preparation at the sentencing phase.

*Id.* at 84, 105 S.Ct. at 1096–97 (emphasis added).

Where the defendant raises the defense of insanity, an affirmative defense, the Court held that the defendant must make an adequate showing of need for the psychiatric assistance. *See also Moore v. Kemp,* 809 F.2d 702, 712 (11th Cir.1987) (examining the minimum required showing), *cert. denied,* 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987). The Court required no such showing on the issue of future dangerousness. *See Ake,* 470 U.S. at 83, 86, 105 S.Ct. at 1096, 1097. The Court merely stated that when the issue is raised by a prosecution witness at sentencing, the defendant has the right to psychiatric assistance.

3. Applicability to Buttrum's Case.

In this case, immediately upon learning of the prosecutor's plan to call Dr. Adams, the defense moved for a continuance and renewed its motion for funds to hire its own psychiatric assistance. The letter of Dr. Adams filed with the prosecution's "Notice of Disclosure" was before the court, and the issue of future dangerousness was raised therein. With the issue of future dangerousness raised, and Buttrum's motion renewed, the right to the assistance protected by *Ake* was triggered. *Ake,* 470 U.S. at 83, 86, 105 S.Ct. at 1096, 1097.[9] The court, however, failed to provide the defendant the kind of assistance contemplated by *Ake.*

*a. Private vs. Public Assistance.*

 Defense counsel argued it needed a private examination from a psychiatrist who could meaningfully assist the defense. It argued that Adams's testimony would be devastating if the defense could not counter Adams's diagnosis with its own doctor's diagnosis.

In *Ake,* the Court noted:

This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purposes we have discussed, and as in the case of the provision of counsel we leave to the States the decision on how to implement this right.

*Id.* at 83, 105 S.Ct. at 1096.

Here, the trial court denied the motion for funds to hire a private doctor to assist in the defense but ruled that the defense could use the services of the doctors at the state facilities. The petitioner asserts that

---

9. In *Ake,* the future dangerousness of the defendant was a statutory aggravating factor, while in Georgia it is not. From this one might contend that *Ake* would not require the provision of expert assistance to a defendant in a Georgia capital sentencing procedure. *Cf. Bowden v. Kemp,* 767 F.2d 761, 764 n. 5 (11th Cir.1985), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2291, 90 L.Ed.2d 732 (1986).

The Court declines to so limit the reach of *Ake.* The significance of an expert's prediction of the defendant's future dangerousness in a death penalty sentencing trial is so great that the rule of *Ake* must be applied even though future dangerousness in not a statutory aggravating circumstance in Georgia. In Georgia, once a sentencing jury has found the existence of one aggravating factor, it nevertheless may recommend a sentence of life for any reason. The decision to grant a life sentence instead of death could hardly be affected more than by the perceived future dangerousness of the defendant. The Court thus holds that *Ake* is not limited to instances where future dangerousness is a statutory aggravating factor.

these sources were inadequate to effectively oppose Dr. Adams for the same reasons she stated those doctors were inadequate initially.

The petitioner's argument that state doctors are categorically not qualified is meritless. Buttrum contends that fundamental fairness required that if the prosecution expended public funds to hire a private psychologist, she had the right to hire such a doctor of her own. *Ake*, however, explicitly states that the defendant was entitled necessarily neither to a psychiatrist of her own liking, nor necessarily to funds with which to hire her own psychiatrist. Nothing in *Ake* or in its Eleventh Circuit progeny provides that a public doctor is inadequate *per se*, without some showing of bias or other inadequacy.

Buttrum nevertheless contends she was entitled to a private doctor because *Ake* entitles the indigent defendant to a *confidential* evaluation. She maintains that *Ake* stated that the request for psychiatric assistance is to be made *ex parte, see id.* at 82, 105 S.Ct. at 1095, implying a need for confidentiality. Since the state law psychiatrist-patient privilege does not cover evaluations by state doctors conducted pursuant to court order, Buttrum maintains, the assurances of *Ake* could not be realized by state doctors. A careful reading of the Georgia cases on this subject, however, shows this contention to be without merit.

It is true that where a court orders a psychiatric examination to determine the competency of a defendant, the privilege does not apply. *See Moody v. State*, 244 Ga. 247, 250, 260 S.E.2d 11 (Ga.1979); *Massey v. State*, 226 Ga. 703, 704–05, 177 S.E.2d 79 (Ga.1970), *cert. denied*, 401 U.S. 964, 91 S.Ct. 984, 28 L.Ed.2d 248 (1971); *see Kimble v. Kimble*, 240 Ga. 100, 101, 239 S.E.2d 676 (Ga.1977). The rationales for the nonapplicability of the privilege are first that the evaluations are not made for *treatment*, which is required for operation of the privilege, and, second, in such cases, the psychiatrist is a witness for the *court*, not for the defense.

Both rationales work against Buttrum. Under the first rationale, if the trial court appointed a public doctor to provide the assistance contemplated by *Ake*, the Georgia privilege would likely apply, because the doctor would be a witness for the defense, not for the court. Under the second rationale, whether a public doctor were appointed or funds granted for a private doctor, the examinations would not be strictly for treatment; therefore, the privilege would not apply. In either event the result would be the same whether the doctor was public or private. Thus, Buttrum's contention, based on that the psychiatrist-patient privilege is without merit.

The Court concludes that the services of a psychiatrist from the public sector of the state are not *per se* inadequate under *Ake*. A psychiatrist or psychologist who works in the public sector may be utilized, as long as the professional's position is not related to the criminal justice system or the prosecution. The state doctors offered by the trial court were not inadequate merely because they were state doctors.

### b. The Ake Violation.

 The trial court violated Buttrum's due process right under *Ake* for a different reason: The court failed to provide the scope of psychiatric assistance contemplated by *Ake*. Under *Ake* the defendant is entitled to "a psychiatric examination on relevant issues, to the testimony of the psychiatrist, and to assistance in preparation at the sentencing phase." *Ake*, 470 U.S. at 84, 105 S.Ct. at 1097. The Court explained that "[w]ithout a psychiatrist's assistance, the defendant cannot offer *a well-informed expert's opposing view*, and thereby loses a significant opportunity to raise in the jurors' minds questions about the State's proof of [future dangerousness]." *Id.* It is essential for the " 'defendant's doctors' " to be "competent to 'uncover, recognize, and take due account of ... short comings' in predictions on this point." *Id., quoting Barefoot*, 463 U.S. at 899, 103 S.Ct. at 3397. While Buttrum may go too far in arguing that the *Ake* psychiatrist must be "part of the defense team," it is clear that *Ake* contemplates a psychiatrist who will work closely with the defense

by conducting an independent examination, testifying if necessary, and preparing for the sentencing phase of the trial. This assistance the trial court failed to provide.

In denying Buttrum's request for funds, though the issue of future dangerousness had been raised, the trial court saw no need for any further examinations of Buttrum, and the assistance it was prepared to offer was far more limited than that contemplated by *Ake*. When counsel stated that additional examinations were needed and that the state evaluations on competency were inadequate to counter Dr. Adams's opinion, the court stated:

> There's no indication that any further psychiatric examination would be any different.

Respondent's Exhibit 39, Hearing of August 19, 1981, at 7.

The court saw no reason for additional examination on the newly introduced issue of future dangerousness. *Ake* at a minimum requires this much. Moreover, the state doctors have admitted by affidavit they never examined Buttrum to determine future dangerousness or the existence of the disorders diagnosed by Adams. *See* Respondent's Exhibit 33 at 60–61, 62–63.

Further, in its explanation of the assistance that was available from the state doctors, the court stated:

> So as far as your preparation for trial, ... I told you that Tim Bullard *would be glad to sit down and explain any psychiatric terms to you....* That any of those men *will sit down and you can interview them. I mean, they won't come—I don't know that they'd come and sit at the counsel table with you,* but so far as just preparing for cross examination and finding out what psychiatric terms are and all, any of those doctors have always been happy to cooperate.

*Id.* at 8 (emphasis added). While a public sector doctor may fill the *Ake* role, the court must make arrangements that the doctor provide the level of assistance required by *Ake*. *Ake* requires more than explanations of psychological terms and assistance in preparation for cross-examina-

tion. Moreover, the psychiatric assistance offered here apparently was to be limited by the discretion of the doctors as to their level of involvement. *Ake* is based upon the assumption that the defendant is able to obtain and put before the jury his "well-informed expert's opposing view" of the prosecution's testimony. *Id.* at 84, 105 S.Ct. at 1096. In this case, the trial court failed to provide the defense the minimum assistance required by *Ake*. It thereby violated Buttrum's constitutional right to due process of law at her sentencing hearing.

#### c. Harmless Error.

While *Ake* does not require a particular showing of prejudice, the error clearly was not harmless in this case. This case presents a classic example of the one-sided sentencing hearing that *Ake* stands against. It must be remembered that *Barefoot* permitted evidence of future dangerousness at all, only on the assumption that the defendant would have his own doctor's "opposing" testimony. Opposing opinions from doctors such as those submitted by Buttrum at her state habeas hearing, could likely have refuted Dr. Adams's testimony and affected the outcome of the sentencing trial. If the trial court had appointed a public psychiatrist to provide the assistance contemplated by *Ake*, or provided funds for the defense to obtain such assistance, such testimony could have been presented to the jury. There exists a reasonable possibility that had the jury heard Adams' opinion of future dangerousness so severely criticized, the jury might have concluded that Janice Buttrum's propensity for future dangerousness was not so great as to require her execution.

Buttrum's right to due process as provided by *Ake* was violated, and habeas corpus relief is warranted on this ground.

#### D. The Estelle v. Smith Issue.

Buttrum also contends that the admission of Adams's testimony violated her Fifth and Sixth Amendment rights under *Estelle v. Smith*, 451 U.S. 454, 462, 101

S.Ct. 1866, 1872, 68 L.Ed.2d 359 (1981). *Smith* provides that the state may not use evidence from a psychiatric interrogation in a capital sentencing proceeding unless the defendant received proper *Miranda* warnings prior to the examinations. Buttrum contends that she was never given proper *Miranda* warnings prior to her competency examinations and that the reports of these examinations were used by Adams in his testimony at the sentencing trial. The respondent contends that because the defense requested the competency evaluation, she consented to use of the reports and waived her Fifth and Sixth Amendment rights.

Respondent is incorrect on this point. The court in *Battie v. Estelle*, 655 F.2d 692 (5th Cir. Sept.1981), held that a request for competency and sanity evaluations do not permit the examining psychiatrist to testify on the issue of future dangerousness upon which the defendant never consented to being examined. *See id.* at 702. In open court, prior to being examined, Janice Buttrum explicitly stated that she waived her privilege only as to examinations of competency and sanity, not as to other issues. Respondent's Exhibit 14 at 34–35. Thus, the evaluating psychiatrist could not use results of those evaluations to testify on her future dangerousness.

The issue in this case is slightly more complicated because Dr. Adams and not the examining psychologists used the reports as a basis for his opinion. Adams testified that his opinion was based upon FBI reports, Ms. Buttrum's confessions, reports from Central State Hospital, the autopsy report and some photographs of the victim. Of the reports from Central State, he reviewed Ms. Buttrum's social history, the psychiatric reports, the psychological evaluations, and the ward notes. Respondent's Exhibit 4 at 1817–18.

It is clear from *Smith* and *Battie* that the original doctors could not have testified on future dangerousness from their evalua-

tion of Buttrum. While no binding precedent directly on point has been located or cited to the Court, the Court has no difficulty in holding that, just as the examining doctors could not use the evaluations to give an opinion on future dangerousness, a different doctor could not take those same reports and use them for the same purpose. Buttrum's Fifth and Sixth Amendment rights as a result were violated by the admission of Adams's testimony, and a new sentencing hearing on this ground is warranted.

### E. The Exclusion of Mitigating Evidence.

■ Buttrum next contends that the trial court's exclusion of certain mitigating testimony violated her Eighth Amendment right to a fair sentencing hearing. The mitigating testimony would have been that of a social worker, Jesse Collette, about Danny Buttrum's violent history. Buttrum sought to introduce Collette's testimony to counter the State's portrayal of Janice Buttrum as the primary actor in the murder. Collette treated Danny Buttrum in 1977 in a crisis intervention session and determined that he required inpatient psychiatric care because he was becoming schizophrenic.

The proposed testimony was that Danny Buttrum had complained that he was preoccupied with sex and at times felt uncontrollable urges to rape; that he had a drinking problem and nightmares that someone was trying to kill him; that he had homicidal feelings toward his mother, and had attacked her with a butcher knife and scissors.

On hearsay grounds, the prosecution objected to Collette revealing any statements of Danny Buttrum about his prior history. While the objection was based on the hearsay rule, the court sustained it on relevancy grounds.[10] Finding the testimony related to Danny Buttrum and not to Janice, the court ruled it no more relevant than the

---

10. In this Court, the respondent does not contend that the testimony was inadmissible hearsay. *Cf. Green v. Georgia*, 442 U.S. 95, 96–97, 99 S.Ct. 2150, 2151–52, 60 L.Ed.2d 738 (1979) (ex-

clusion of evidence at sentencing phase based on Georgia hearsay rule unconstitutional where testimony bore sufficient indicia of reliability).

personal history of any other person on death row.

Buttrum contends the testimony was relevant and its exclusion unconstitutional because it left her without evidence to counter the prosecutor's argument that "[t]here's been no evidence that he'd ever done anything like this until he got with her." The respondent counters that the testimony was not relevant because it concerned Danny Buttrum not Janice Buttrum, it was cumulative, and its exclusion was harmless since evidence from other witnesses on Danny Buttrum's violent history had been admitted.

In *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978), the Court held that the sentencer may "not be precluded from considering, *as mitigating factor, any aspect of a defendant's character* or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id.* at 604, 98 S.Ct. at 2964 (first emphasis by *Lockett* Court, second by this Court). Moreover, "family background and personal history" have long been treated as mitigating evidence. *Eddings v. Oklahoma*, 455 U.S. 104, 117, 102 S.Ct. 869, 878, 71 L.Ed.2d 1 (1982) (O'Connor, J., concurring).

 Different degrees of culpability among co-defendants are relevant to the individualized sentencing mandated by the Eighth Amendment. *See Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In *Thompson v. Wainwright*, 787 F.2d 1447 (11th Cir.1986), *cert. denied*, 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987), the court held that counsel's failure to investigate a codefendant's more violent background fell outside the range of reasonably effective assistance. "In a capital case, where a defendant's life may well depend on the extent and nature of his participation, the background of a codefendant could be crucial." *Id.* at 1450. While the court in *Thompson* found the error not prejudicial, in the instant case, the question of who was the primary actor was central to the defense theory of the case.

At sentencing Janice Buttrum's defense was twofold. She asserted that her age, lack of prior record, horrendous upbringing, and personal history placed her outside the group of offenders for whom the Georgia death penalty is intended. Second, she argued that Danny Buttrum played the dominant role in the murder, rendering her culpability less than that warranting death. The state portrayed Janice Buttrum as the primary perpetrator.

The trial court's exclusion of Collette's testimony as irrelevant was erroneous. The testimony clearly was relevant. It was relevant as family background information; it concerned her husband. During the two years prior to the crime, her life was intrinsically linked to his. It also was relevant to the defense that Danny Buttrum was the initiator and that Janice acted under his domination and influence. Danny Buttrum was eleven years her senior, divorced, and beat his teenage wife fifteen to twenty times during their two-year marriage. Collette's testimony about his hostility toward women and his violent, abusive personality were highly relevant to show that she was abused by him and that this abuse could have led her to be submissive toward him and his desires. His urges to rape and his attack on his mother directly countered the prosecution's statements that he "never did anything like this before he got with her." This evidence would have helped prove the defendant's theory of the case.

The respondent contends that any error was harmless because the jury had already heard about Danny Buttrum's prior convictions and violent nature and that Collette's testimony would have been merely cumulative. No other evidence, however, revealed Danny Buttrum's prior urges to rape women, his belief that someone was trying to kill him, and his violent attack on his mother. This evidence was unique; it strongly showed, like no other, that Danny Buttrum could have been the dominant actor in this crime. Where the exclusion of evidence in mitigation "may have affected the jury's decision to impose the death sentence," the exclusion is "sufficiently prejudicial" to require a new sentencing hearing. *Skipper*

**1316**

*v. South Carolina,* 476 U.S. 1, 8, 106 S.Ct. 1669, 1673, 90 L.Ed.2d 1 (1986).

### F. Prosecutorial Misconduct.
#### 1. The *Caldwell* Argument.

Janice Buttrum contends that several remarks of the prosecutor during closing argument violated her constitutional rights. She contends the prosecutor violated *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), by suggesting that the responsibility for the sentencing decision lay elsewhere than with the jury. She contends the prosecutor violated this rule in two ways. First, the prosecutor minimized the jurors' responsibility by telling them that the sole responsibility for the death sentence lay on Janice Buttrum who "signed her own death warrant." He then told them that they were not individuals, but a group that was "merely one cog in the criminal process."[11] To this, defense counsel objected and moved for a mistrial. The court overruled the objection and denied the motion without explanation. The prosecutor also quoted from the Bible: "He is the servant of God to execute his wrath on the wrongdoer." Buttrum contends that these statements by the prosecutor denied her constitutional rights.

The respondent cites to the well-established rule that for prosecutorial comments to warrant relief, they must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986); *see also Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The respondent

points out that just prior to the challenged statements the prosecutor clearly set out the law of Georgia as to imposition of the death penalty, which made clear that the jury had the responsibility to determine whether Janice Buttrum should be put to death.

In *Caldwell,* the Supreme Court held a death sentence invalid because "it is unconstitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell,* 472 U.S. at 328–29, 105 S.Ct. at 2639. There the jury had been told that their decision was "automatically reviewable," thus shifting the sense of responsibility from the jury to the appellate courts. When objection was made to this comment, the court affirmed the propriety of the comment.

In *Tucker v. Kemp,* 802 F.2d 1293 (11th Cir.1986) (*en banc*), *cert. denied,* 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987), the court reiterated that the proper standard for evaluating prosecutorial misconduct is "whether the proceeding at issue was rendered fundamentally unfair by the improper argument." *Id.* at 1295 (citation omitted). In making this fundamental fairness determination, the court borrowed the prejudice standard from *Strickland v. Washington,* 466 U.S. 668, 693–94, 104 S.Ct. 2052, 2067–68, 80 L.Ed.2d 674 (1984): whether there exists " 'a reasonable probability that, in the absence of the offending remarks, the sentencing outcome would have been different.' " *Tucker,* 802 F.2d at 1295 (citation omitted). The court ex-

---

**11.** The challenged portion of the prosecutor's argument was as follows:

Ladies and Gentlemen, as I said earlier, it is she, the Defendant, that has signed her own death warrant; she, herself, has brought these *proceedings down about her. No one—no* one else, including you should feel any responsibility for what happens to her, for it is she that has caused us all to be here today, for it is she that broke into that room that night by trick, for it is she that participated in the rape over and over again of Demetra Parker, for it is she that helped stabbed [sic] Demetra Parker ninety-seven times, for it is she that

left her in that condition with that tooth brush holder in her vagina, for it is she that left her there to die, for it is she that has brought her whole world crumbling down about her, and that it is she that has, in reality, signed her own *death warrant. She is responsible for* her acts. Now, she is responsible for her death, no one else. You are a group; you are not simply fourteen individuals. Do not consider that any one of you is throwing the switch. You are merely one cog in the criminal process.

Transcript at 2170–71.

plained that in that case, the fundamental fairness standard was the proper one, not the Eighth Amendment's "heightened requirement of reliability in a capital case." The latter was employed in *Caldwell* because there the trial judge approved of the prosecutor's comments, while in *Tucker* no such approval was voiced. *Id.*

The standard to be applied in the instant case, therefore, depends upon whether it falls under *Caldwell* or *Tucker.* This Circuit distinguishes between cases where the trial court explicitly approves of the prosecutor's improper comments and where the court merely fails to correct those comments. In this case, the defense objected to the comments. The court overruled the objection and denied the motion for a mistrial. The court did not *state* its approval of the comments, but its overruling the objection amounts to the same thing. When the trial court indicates approval of the prosecutor's comments, "it [is] as if the jury received an erroneous instruction from the court." *Tucker,* 802 F.2d at 1295.

The Eighth Amendment's heightened requirement of reliability in a capital case is therefore the standard for this case. The *Caldwell* standard is that relief must be granted unless the Court can say that the prosecutor's attempt to minimize the jury's sense of responsibility for determining the appropriateness of death, "had no effect on the sentencing decision." *Caldwell,* 472 U.S. at 341, 105 S.Ct. at 2646.

In this case, while it is true that defense counsel and the trial court later informed the jury that they were the ones to determine whether Janice Buttrum received the death penalty, the prosecutor's forceful argument that the ultimate responsibility lay with Janice Buttrum herself, and that they were merely "one cog in the criminal process" *may* have affected the sentencing decision. Further, the comment that they were merely a cog in a larger system is more egregious than the "last link" arguments held not prejudicial under the fundamental fairness standard applied in *Tucker.* The *Tucker* court noted that an argument that the jury was the last link in the system cuts both ways. It could as easily be

interpreted as indicating the *importance* of the jury's role as the ultimate arbiter. Here, the "mere cog in the wheel" argument cuts only one way. Accordingly, under the standard of prejudice announced in *Caldwell,* this issue warrants grant of the writ.

### 2. The *Eberhart* Error.

■ Next, Janice Buttrum contends that the prosecutor improperly told the jury that mercy and sympathy had no legitimate role in its deliberations. The prosecutor stated:

> You took an oath at the beginning of the case. You said, "I do," to "You shall well and truly try the issue formed upon this bill of Indictment between the State of Georgia and ... Janice Buttrum, who is charged with Murder and Theft By Taking, and a true verdict give in accordance to the evidence;" not according to mercy, not according to sympathy, not according to feeling sorry for a Defendant. If you want to feel sorry for somebody, feel sorry for those people. [Indicating.] Mercy? I submit to you that we should have no sympathy with the sentiment that springs into action whenever a criminal is about to suffer for a crime. Society demands that the crime be punished and criminals warned. The false humanity that starts and shutters [sic] when the ax of justice is about to fall is a dangerous element for the peace of society. We have had too much of this mercy. It is not true mercy. It looks only at the criminal.

Tr. at 2168–69.

This statement was modeled on the 19th Century *Eberhart* quotation, *see Eberhart v. State,* 47 Ga. 598, 609–10 (1873), which has been condemned by both the Eleventh Circuit and the Georgia Supreme Court. *See Drake v. Kemp,* 762 F.2d 1449, 1459 (11th Cir.1985) (*en banc*), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986); *Wilson v. Kemp,* 777 F.2d 621 (11th Cir.1985), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986); *Potts v. Zant,* 734 F.2d 526, 535–36 (11th Cir.1984), *cert. denied,* 475 U.S. 1068, 106 S.Ct. 1386, 89 L.Ed.2d 610 (1986).

The court in *Potts* and *Drake* held use of the quotation in closing to be unconstitutional both because of the content of the quote and because it was attributed to a Justice of the Georgia Supreme Court. In *Wilson*, however, the court found the quotation *improper even though it was attributed not to the Georgia Supreme Court but to a "noted legal scholar in the 1800's [of whom] I think the Court is well aware."* The *Wilson* court held the quotation improper because "it is not a correct representation of the law that controls capital sentencing." *Wilson*, 777 F.2d at 624. Thus the rule as applied in *Wilson* is based on "the *content of the Eberhart language and does not depend on the source to which the passage was attributed." Id.* (emphasis added). The language is improper because its import is that

> a sense of mercy should not dissuade one from punishing criminals to the maximum extent possible. This position on mercy is diametrically opposed to the Georgia death penalty statute, which directs that "the jury shall retire to determine whether any mitigating or aggravating circumstances ... exist and whether to recommend mercy for the defendant." O.C.G.A. § 17–10–2(c).

*Wilson*, 777 F.2d at 624. While the prosecutor may argue that mercy is not warranted by the facts of a certain case and the history of a particular defendant, *Wilson*, 777 F.2d at 626, "when the prosecutor argues that it is mercy itself that is inappropriate, the jury is improperly told that the concept of mercy—the most significant factor which might point toward a choice of life imprisonment—is illegitimate." *Id.*

Similarly, in Drake, the court had found "the *content* of the *Eberhart* quote" to be "fundamentally opposed to current death penalty jurisprudence." *Drake*, 762 F.2d at 1460, quoted in *id.* at 626 (emphasis added). The passage was found not only erroneous but prejudicial because "in misstating the law on this critical sentencing consideration, the passage ... could likely have had a substantial effect on the jury's decision." *Id.* at 626. "By undermining mercy as a valid sentencing consideration, *arguments such as those* represented by

the *Eberhart* quote strike at *the most important* component of a capital jury's discretion favoring capital defendants." *Id.* at 626 (emphasis added).

In this case, the prosecutor did not attribute the passage to any source. The attribution given, however, was not the essential cause of prejudice in *Wilson* or *Drake*. While the *Drake* court considered significant the prosecutor's attribution, the court stated:

> [h]owever, if the *Eberhart* language were simply presented by the prosecutor, *unbolstered by any attribution*, it would still cause us great concern because of its tendency to mislead the jury about the proper scope of its deliberations.

*Id.* at 626 (emphasis added).

The reasoning in these cases makes clear that the comments of the prosecutor in this case were both improper and prejudicial because of their content, even though was made without attribution. In addition, the quotation, prejudicial in itself, was clothed with authority of a different kind. The prosecutor began the passage immediately after and *in the same sentence* as his recitation of the jurors' oath. This placement colored the quotation with the aura of duty of the oath itself. Its placement suggested that it was not merely rhetoric but a pronouncement of duty. The use of this quotation in Buttrum's sentencing hearing was both improper and prejudicial and mandates grant of the writ for a new sentencing hearing.

### 3. The *Booth* Error.

The petitioner next contends that the prosecutor improperly urged the jury to impose a sentence of death after comparing Janice Buttrum with the victim, Demetra Parker.

> Look at Demetra; look at the Defendant. She, summarily, slowly, surely murdered and participated in the rape of Demetra Faye Parker without any due process of law. Demetra Faye Parker had no lawyers; Demetra Faye Parker had no public hearing; Demetra Faye Parker had no

right to counsel; Demetra Faye Parker had no verdict based upon law.

Tr. at 2167.

The Supreme Court has "reject[ed] the contention that the presence or absence of emotional distress of the victim's family, or the victim's personal characteristics are proper sentencing considerations in a capital case." *Booth v. Maryland*, 482 U.S. 496, 507, 107 S.Ct. 2529, 2535, 96 L.Ed.2d 440 (1986) (footnote omitted). The references to the personal characteristics of Ms. Parker in this case, however, were sufficiently brief that one "cannot conclude that they injected prejudicial or irrelevant material into the sentencing decision." *See Brooks v. Kemp*, 762 F.2d 1383, 1409 (11th Cir.1985) (*en banc*), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986).

The other challenges to the prosecutor's closing arguments have been carefully examined and found to be without merit.

### G. The Charge on Aggravating Circumstances.

Petitioner Buttrum contends that the trial court improperly instructed the jury with regard to the four aggravating circumstances asserted by the prosecution in favor of the death penalty. The jury recommended imposition of the death penalty after finding the existence of all four of the asserted factors.

■ Buttrum first contends the court improperly charged the jury on the aggravating circumstance of O.C.G.A. § 17–10–30(b)(2). The Court charged the jury as follows:

> The first is: that the offense of murder was committed while the Defendant was engaged in the commission of another felony, to-wit: Rape. Georgia Law defines Rape as follows: 'a person commits rape when he has carnal knowledge of a female forcibly and against her will. Carnal knowledge in Rape occurs when there is any penetration of the female sex organ by a male sex organ.

Transcript at 2206–07. Buttrum contends that this charge was improper because it deflected attention away from the petitioner's personal culpability and toward that of Danny Buttrum. The jury was thus permitted to recommend imposition of the death penalty, she maintains, upon vicarious liability theories of conspiracy and aiding and abetting. She contends the court improperly expanded the scope of the (b)(2) circumstance when she did not and could not have raped Demetra Parker.

This contention is without merit. Petitioner has cited no case in support of her argument, and none has been found by the Court. The one case cited by the petitioner, *Pickens v. Lockhart*, 714 F.2d 1455, 1463–64 (8th Cir.1983), examined an instruction given at the guilt phase of a trial, and is not relevant to this issue. While it is true that Janice Buttrum could not personally rape Demetra Parker, she could be convicted of rape as an aider and abettor. *See* O.C.G.A. § 16–2–20(a) & (b)(3) (person who intentionally aids or abets in the commission of a crime may be charge with and convicted of commission of the crime). Thus the jury could properly find that she committed murder during the commission of the rape. The jury was in no way precluded from focussing solely on *her* conduct. While it knew she personally could not commit rape, it was instructed that she nevertheless could be guilty of rape as an aider and abetter. The jury was properly instructed that it could find the (b)(2) circumstance with the underlying predicate crime of aiding and abetting rape. This issue is without merit.

■ Janice Buttrum next contends that the (b)(7) aggravating factor was improperly explained to the jury. The (b)(7) circumstance provides that a death sentence may be recommended where the murder "was outrageously or wantonly vile, horrible or inhuman in that it involved [a] torture, [b] depravity of mind or [c] an aggravated battery to the victim." O.C.G.A. § 17–10–30(b)(7). Each of these three bases was presented to the jury.[12]

---

**12.** The trial court's charge was as follows:

The second circumstance the State charges is: that The [sic] offense of Murder was out-

Buttrum contends that the trial court failed to guide the jury as to what would support a finding of torture. This contention is meritless. The only element of the (b)(7) circumstance that must be defined so as to adequately guide the jury in its deliberations is that of "aggravated battery." *See Morgan v. Zant*, 582 F.Supp. 1026, 1035 (S.D.Georgia 1984), *aff'd in relevant part, rev'd on other grounds*, 743 F.2d 775, 781 (11th Cir.1984). The instruction on torture was adequate, and sufficient evidence clearly existed for the jury to find torture in this case.

Buttrum also contends that while the trial court properly charged the jury on the "aggravated battery" circumstance, the circumstance does not apply because no member of the victim's body was rendered useless prior to death. This contention is also meritless. The proper definition, as given by the court, is in the disjunctive. One basis for the finding is that the murder was committed by "seriously disfiguring the body or member thereof." A glance at the photographs of the victim in this case reveals the existence of this factor and the meritlessness of this ground for relief.

Buttrum correctly contends, however, that the court improperly defined the term "depravity of mind." The trial court used a definition from *Black's Law Dictionary* which was different from the definition approved by the Georgia Supreme Court in *West v. State*, 252 Ga. 156, 313 S.E.2d 67 (Ga.1984). There the court presented an example of a proper instruction of "depravity of mind as a reflection of an utterly corrupt, perverted or immoral state of mind." *Id.* at 161, 313 S.E.2d 67. The court there held that while no instruction on depravity of mind is required, if the court undertakes to give such instruction, "it should do so correctly." *Id.* at 159, 313 S.E.2d 67. Here, the instruction broadened the scope of the aggravating circumstance. The jury was instructed it could find the (b)(7) circumstance merely on a finding of "deficiency in moral sense and rectitude" rather than a finding of "utterly corrupt, perverted or immoral." The instruction more broadly defined depravity of mind and required a much lower threshold than the proper definition. The instruction therefore was improper.

The improper instruction, nevertheless, does not require reversal. The instructions on the other aggravating circumstances were proper, and petitioner has not shown that the evidence was insufficient to find those circumstances. Because of the existence of other valid and legally appropriate circumstances to support the death penalty, relief is not warranted where one basis is found invalid. *See Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

### H. The Charge on Mitigating Evidence.

■ Buttrum contends that the court carefully explained each of the aggravating circumstances claimed by the state; but on mitigating circumstances, the court, near the end of the charge, in a perfunctory manner, gave a brief and "wholly unilluminating" charge on mitigating circumstanc-

rageously and wantonly vile, horrible and inhuman, in that, it involved torture to the victim. The third circumstance the State charges is: that the offense of Murder was outrageously and wantonly vile, horrible and inhuman, in that, it involved depravity of mind of the Defendant. Now, Black's Law Dictionary defines a depraved mind as follows "an inherent deficiency in a moral sense and rectitude. Rectitude is defined as the quality or state of being straight or having morale integrity. Now, the way I've worded that; the definition may be confusing, so let me repeat it: Depravity of mind is inherent deficiency in moral sense and rectitude. Rectitude is defined as the quality or state of being straight or having moral integrity. The word 'depraved' has also been defined as 'marked by corruption or evil, or especially perverted.'

The fourth Statutory aggravating circumstance alleged is: that the offense of Murder was outrageously and wantonly vile horrible, and inhuman, in that it involved an aggravated battery to the victim. In this regard, it is the Law in Georgia that a person commits aggravated battery when he maliciously causes bodily harm to another by depriving him of a member of his body, or by rendering a member of the body useless, or by seriously disfiguring the body or member thereof.

Transcript at 2209–10.

es.[13] She contends that the charge whole emphasized the importance of aggravating circumstances and minimized the importance of mitigating circumstances.

The standard to be applied upon a challenge to the adequacy of an instruction on mitigating circumstances is whether any reasonable juror could have failed to understand the challenged instructions and the role of mitigation. *High v. Kemp,* 819 F.2d 988, 991 (11th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988); *citing, inter alia, Peek v. Kemp,* 784 F.2d 1479 (11th Cir.1986) (*en banc*), *cert. denied,* 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986). "[T]he ultimate question is whether there is a reasonable possibility that the jury understood the instructions in an unconstitutional manner." *Peeks,* 784 F.2d at 1479.

In *Spivey v. Zant,* 661 F.2d 464 (5th Cir. Unit B 1981), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982), the court held that failure to mention and define mitigating circumstances in a capital case violates the constitution. The court noted that the jury must be explicitly instructed about mitigating circumstances and established the following standard:

> So long as the instruction clearly communicates that the law recognized the existence of circumstances which do not justify or excuse the offense, but which, in fairness or mercy, may be considered as extenuating or reducing the degree of moral culpability and punishment ...,

this portion of the constitutional requirement is satisfied.

*Id.* at 471 n. 8. In *Peek,* the court the court approved of a sentencing instruction that had been given in *Tucker v. Zant,* 724 F.2d 882, 891 (11th Cir.), *vacated on other grounds,* 724 F.2d 898 (11th Cir.1984), *reinstated in relevant part sub nom. Tucker v. Kemp,* 762 F.2d 1480, 1482 (11th Cir.1985) (en banc), *vacated on other grounds,* 474 U.S. 1001, 106 S.Ct. 517, 88 L.Ed.2d 452 (1985), *reinstated,* 802 F.2d 1293 (11th Cir.1986), *cert. denied,* 481 U.S. 1073, 107 S.Ct. 2472, 96 L.Ed.2d 364 (1987). The *Peek* court held that the instruction given in *Tucker* was "manifestly desirable." *Id.* at 1490 n. 12. The court paraphrased the instruction as follows: "[A] mitigating circumstance is a factor which, while not constituting a legal excuse or justification for the offense, could be considered in fairness and mercy as extenuating or reducing the degree of moral culpability or blameworthiness." *Id.* This paraphrase of the *Tucker* instruction, approved by the court, is nearly identical to the instruction given in Buttrum's case. Buttrum's contention that the instruction in her case was inadequate is meritless.

Buttrum also contends that an instruction similar to one proposed by the defense should have been given.[14] This instruction outlined a number of specific mitigating circumstances about which the defense had

---

**13.** The court's charge was the following:

In arriving at your determination, you are to consider all of the evidence received in Court, presented by the State and by the Defendant throughout the trial before you. You should also consider, if any, facts of mitigation.

I Charge you that mitigating circumstances, or facts, are those which do not constitute a justification of excuse for the offense in this case, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame.

Further, Jurors, I instruct you that in fixing the Defendant's sentence, you are to avoid any influence of passion, prejudice, or any other arbitrary factors.

Transcript at 2213.

**14.** The defense sought the following charge on mitigating circumstances:

I charge you that in determining whether or not to impose the death sentence on the defendant, you are authorized to take into consideration the personal characteristics of this defendant to mitigate against capital punishment, including but not limited to 1) Defendant has no significant history of prior criminal activity; 2) the murder was committed while the Defendant was under the influence of extreme mental or emotional duress; 3) the Defendant acted under duress or under the domination of another person; 4) at the time of the murder, the capacity of the Defendant to conform her conduct to the requirements of the law was impaired; 5) the youth of the Defendant at the time of the crime; 6) the background of the Defendant; 7) family status of the Defendant; 8) remorse of the Defendant; 9) Other.

Respondent's Exh. 1 at 482.

**1322**

submitted evidence. Petitioner's argument however, is foreclosed by *Tucker:*

> Nothing in any of our cases suggests that such explicit enumeration of possible mitigating factors is required. On the contrary, *Spivey's* indication that a judge must 'tell the jury what a mitigating circumstance is and what its function is' ... contemplates a more general explanation.... Defendant's counsel is ... free to direct the jury's attention to specific mitigating circumstances, but the Constitution does not oblige the trial court to do so.

*Tucker,* 724 F.2d at 892.

Noteworthy in this case is that the trial court allowed extensive mitigating evidence to be presented, including the details of Janice Buttrum's tragic upbringing. A reasonable juror would have understood that, in light of the evidence and the court's instructions, this extensive evidence about Janice Buttrum was presented in mitigation of punishment. Thus, taking the instruction as a whole in the context of the entire trial, no reasonable juror could have failed to understand the challenged instructions and the role of mitigation. This issue does not warrant the grant of habeas relief.

ACCORDINGLY, Petitioner Buttrum's petition for Writ of Habeas Corpus is GRANTED in part and DENIED in part. The writ of Habeas Corpus is DENIED as to her conviction of murder, and it is GRANTED as to the sentence of death. Respondent Black is ORDERED to grant the petitioner a new sentencing hearing to commence within six months from the date of this order, or if an appeal is taken from this order, within six months of the date this order becomes final.

IT IS SO ORDERED.